= = =

## Case No. 397.

### The ANN.

### [1 Gall. 62.][1]

Circuit Court, D. Massachusetts. May Term, 1812.

INTERNATIONAL LAW — JURISDICTION OVER TIDE WATERS — EMBARGO ACT—CONSTITUTIONAL LAW —WHEN STATUTES TAKE EFFECT.

1. Every nation has exclusive jurisdiction over the waters adjacent to its shores, to the distance of a cannon shot or marine league.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867.]

[See 1 Whart. Int. Law, § 32; Manchester v. Massachusetts, 139 U. S. 240, 11 Sup. Ct. 559.]

2. A departure from any place within the jurisdictional limits of the United States, although such place be not within any port, is within the provisions of the embargo act of 22d December, 1807, [2 Stat. 451,] c. 5.

[See note at end of case.]

3. Where no other time is fixed for the operation of a penal statute, it takes effect from the time of its passage: and ignorance of the existence of such act forms no legal excuse for a violation of it.

[Cited in U. S. v. Arnold, Case No. 14,469; Smith v. Draper, Id. 13,037; Lapeyre v. U. S., 17 Wall. (84 U. S.) 197; U. S. v. Chong Sam, 47 Fed. 883.]

[See note at end of case.]

[Appeal from the district court of the United States for the district of Massachusetts.]

In admiralty. The brigantine Ann was seized by the collector of the port of Newburyport, and libelled in the district court, for that said brig, on the 12th day of January, 1808, departed from said port and from the limits and jurisdiction of the United States, and proceeded on a foreign voyage, to wit, to the island of Jamaica, in the West Indies, contrary to the act of the 9th of January, 1808, c. 8, [2 Stat. 453.] It appeared that the Ann sailed from Alexandria, in the District of Columbia, with a cargo of flour, on the 22d day of December, 1807, bound for Newburyport. On the 31st of December, the brig arrived at Martha's Vineyard, where the captain and crew heard of the embargo. On the 12th of January, 1808, the brig arrived off the port of Newburyport, and anchored between two and three miles from Newburyport bar, (which is the limit of the port of Newburyport,) and about the same distance from the neighboring land. A part of the crew were here discharged, and a new crew [obtained] in their stead, and also a supercargo came on board. After taking in some provisions, and stores, and water, the brig sailed on the 13th of January for Jamaica, where she arrived in about 27 days, landed and sold her cargo, and returned to the United States with a cargo of rum; and was afterwards seized. It also appeared that [Isaac] Tenny, one of the claimants, had full notice of the transactions while the Ann lay off Newburyport, and assisted or at least assented thereto. [Affirmed.]

G. Blake, for the United States.
S. Dexter, for claimant.

[Before STORY, Circuit Justice, and DAVIS, District Judge.]

STORY, Circuit Justice. As the Ann arrived off Newburyport, and within three miles of the shore, it is clear that she was within the acknowledged jurisdiction of the United States. All the writers upon public law agree that every nation has exclusive jurisdiction to the distance of a cannon shot, or marine league, over the waters adjacent to its shores, (Bynk. Qu. Pub. Juris. 61; 1 Azuni, [Mar. Law,] 204, § 15; Id. p. 185, § 4:) and this doctrine has been recognized by the supreme court of the United States. [Church v. Hubbart,] 2 Cranch, [6 U. S.] 187, 231. Indeed

---

[1][Reported by John Gallison, Esq.]

such waters are considered as a part of the territory of the sovereign. It is said in behalf of the claimant, that the embargo was not designed to operate upon vessels, unless they were within the ports of the United States. But the language of the act of 22d December, 1807, c. 5, [2 Stat. 451] is, that an embargo be laid on all ships and vessels in the ports and places within the limits and jurisdiction of the United States. Now the Ann was certainly in a place within the jurisdiction of the United States, and I do not feel at liberty to narrow by construction the express words of the Legislature.

A further objection has been taken to the allegations in the libel; but upon examination I find, that though very irregularly made, there is a substantial statement of the offence within the 3d section of the act of 9th Jan. 1808. But the main objection urged in behalf of the claimants is of a more important character. The act, under which the brig is libelled, received the signature of the president on the 9th of Jan. 1808, [2 Stat. 453,] and on that day became a law. But it is admitted, that it was not known at Newburyport on the day when the Ann sailed, and consequently that the claimants could not take notice of it. Now it is contended, that though a statute takes effect from its passage, yet a reasonable time must be allowed for its promulgation, so that the citizens may have notice of its existence, and that no person can be liable for an offence committed against such act, until such a time has elapsed, as will enable him, with reasonable diligence, to ascertain its prohibitions, otherwise an innocent man might be punished for actions, which were innocent for aught he knew, or could by possibility have known, at the time of their being done. And it is perfectly immaterial, whether such punishment be inflicted on his person or his property. In illustration of this doctrine, passages have been read from Blackstone's Commentaries (Bl. Comm. 44, 46) on the elementary principles of natural and civil law, and also from the constitution of the United States, where it prohibits the enactment of any ex post facto laws. I was much pressed by the argument of the learned counsel on this point. It would seem founded in the principles of good sense, and natural equity. And it is very certain, that the Ann was not by any law subject to forfeiture, (whatever might be the case as to the claimants in person) until the act of 9th Jan. 1808. The argument perhaps scarcely has its full weight, when applied to the present case, because the claimants were acting manifestly in violation of the original act, laying an embargo, and could not, as to that act, have any pretence to allege their own ignorance. But this circumstance ought not perhaps to vary the legal result. I will therefore consider the question, as though it stood open between parties perfectly innocent of any intended violation of law. At common law,

all acts of parliament, unless another period is fixed, took effect, by relation, to the first day of the session: so that if an act had been brought in at the close of the session, and passed on the last day, which made an innocent act criminal, or even a capital offence, and if no day was fixed for the commencement of its operation, it had the same efficacy as if it had passed on the first day of the session; and all, who during a long session, had been doing an act, which at the time was legal and inoffensive, were liable to suffer the punishment prescribed by the statute. To be sure, this doctrine seems flatly unjust; but, as Christian says, (1 Bl. Comm. 70, note 4,) it is agreeable to ancient principles. Lord Coke lays down the position in 4 Inst. 25, and cites 33 Hen. 6, 17, which, upon examination, I find, fully supports it. The same doctrine is explicitly avowed in Brook's Abridgement, (Brook. Parliament, pl. 8, 6; Relation pl. 43,) and even applied to an attaint; is ruled in Plowd. Comm. 79b, and recognized in several other reporters, ([Standen v. University,] W. Jones, 22; [Henly v. Jones.] 1 Sid. 310, and cases cited; [Latless v. Patten,] 4 Term R. 660, note a;) was held by all the judges of England in Panter v. Attorney General, (6 Brown, Parl. Cas. 486;) and finally was declared too firmly fixed to admit of question in Latless v. Patten, 4 Term R. 660. The whole current of authorities therefore flows uniformly in one channel; and parliament listening at length to the voice of reason, by Stat. 33 Geo. III. c. 13, declared that the date of every statute should be endorsed on its receiving the royal assent, and from that time only should it have effect. 6 Bac. Abr. Gwillim St. (C.) 370.

Since the adoption of the constitution of the United States, which prohibits the passing of ex post facto laws, it seems to be considered, that statutes take effect immediately from the time of their date or passage, and not before; in the same manner as they now do in England. But we shall hardly find a case, in which the promulgation of them has been held necessary, to give them operation. So early as 39 Edw. III., this precise objection was taken; and Sir Robert Thorpe, then chief justice, answered, "although proclamation be not made in the county, every one is bound to take notice of that which is done in parliament; for as soon as the parliament hath concluded any thing, the law intends that every person hath notice thereof, for the parliament represents the body of the whole realm; and therefore it is not requisite that any proclamation be made, seeing the statute took effect before." 4 Inst. 26. The same point is recognized as law in Com. Dig. "Parliament," c. 23, and Hale on Parliament, 36, and in Bac. Abr. Stat. A. It seems, therefore, a settled doctrine, that a statute takes effect from the time of its passage, and needs no promulgation to give it operation. Against principles thus sol-

emnly adjudged, I cannot find a single opposing authority. I am aware of great difficulties in sustaining the reason of these principles; but sitting here, I am bound to pronounce the law as I find it, though I cannot but yield with reluctance to authorities, when they impose restraints on general equity. Decree affirmed.] ↳

[NOTE. Act Cong. Dec. 22, 1807, c. 5, (2 Stat. 451.) was repealed by Act March 1, 1809, c. 24, § 19, (2 Stat. 533.) In Burgess v. Salmon, 97 U. S. 381, it was held that a law increasing the duty on tobacco, which was approved by the president in the afternoon, does not apply to tobacco on which the duty was paid under the former law on the forenoon of the same day. As to such tobacco, it is an ex post facto law. See In re Ankrim, Case No. 395; American Wood-Paper Co. v. Glens Falls Paper Co., Id. 321a.]