Turley, J.,
delivered the opinion of the court-.-
Isham Dyer was indicted and convicted of the offence of retailing spirituous liquors — and as a punishment therefor was sentenced by the judgment of the circuit court of Davidson county to pay a fins of ten dollars, to reverse which, this writ of error is prosecuted, and -it is now contended on his behalf that the judgment of the court below ought, to be reversed— because, 1st, he obtained a license from the county court of Davidson, on the 6th day of February, 1838, to keep an ordinary for twelve months, under which he was by law au-thorised to retail spirits — and that it was during the continuance of that period of time, that the offence, if any, was .committed, for which he stands convicted. And 2d, that he *248 applied to the clerk of the county court of Davidson, for a license to retail spirituous liquors at a period of time, when by law he was entitled to receive it — and that the clerk, who was the agent of the state, authorised to issue it, refused to do so.
The first proposition presents the question, whether there was on the 6th day of February, 1838, any law in force which authorised the clerk of the county court of Davidson to issue a license, under which spirituous liquors might be retailed, and if not, whether there is any law, under the provisions of which a person may be punished for so doing? In order to a correct determination of this question, it becomes necessary to examine the various statutes which have been enacted upon the subject, in order to deduce therefrom the proper rule of action. The offence charged, not being such at common law, it necessarily follows, that if there be no statute prohibiting it, it is not indictable; and also, that though it may be in general prohibited, yet if it be permitted under particular exceptions, and the person charged can bring himself within an exception, it ceases to be an offence.
The act of 1767, c 8, § 16, recognises a law in existence, requiring- ail persons, wishing to keep an ordinary, (which is a public house of entertainment,) to obtain a license for that purpose — the words of the statute are, “Every person who shall obtain a license agreeably to law, to keep an ordinary, &c.
The act of 1779, c 10, § 3 and 12, provides that “no person, not having license for keeping an ordinary, shall sell or retail spirituous liquors in smaller quantities than the quart, under the penalty of one hundred and twenty-five dbllars, nor by larger quantities than the quart, to be drank at the place where sold.
The act of 1811, c 113, § 1, provides, that any'person or persons wishing to keep an ordinary or house of entertainment, shall prefer his or her petition to the county court in which he or she resides, paying a license therefor, for one year; and if said court, upon examination of his or her petition, are satisfied that he or she so applying, are of sufficient probity, and not addicted to any gross immorality, they may *249 order the prayer of the petitioner to be granted. The second section provides, that if any person or persons shall keep an ordinary, or retail liquors, by a smaller quantity than is pointed out by the act of 1779, c 10, without first having obtained a license therefor, as aforesaid, such person or persons shall be liable to an indictment for keeping a tippling house, and upon conviction, shall be fined by the court in a sum not exceeding five dollars, nor less than one dollar. The act of 1823, c 33, provides in § 1, that no county court in this state shall hereafter grant license to any person whatever to keep a public inn, or house of entertainment, unless the person applying for such license, shall first prove in open court, by the testimony of creditable witnesses, that the person applying has a good moral character, and that he, she or they are provided with lodging, stables and house room for the accommodation of travellers and lodgers; and in no case shall such license be granted, if the court shall be of opinion, that the retailing of spirituous liquors is the principal object in obtaining such license.
The act of 1831, c 30, provides in § 1, that any person wishing to retail spirituous liquois in this state is hereby au-thorised to apply to the clerk of the county court, of the county in which he may wish to retail such liquors for a license for that purpose, and said clerk is hereby authorised and required to issue to such person so applying, a license for the term of one year, from the date thereof — said applicant first paying therefor to said clerk the sum of twenty-five dollars.
The act of 1832, c 34, which was passed to amend the act of 1831, c 80, provides in section 1st, that no public housekeeper, or other person whatever, shall retail spirituous liquors in less quantities than one quart, unless he shall first obtain a license for that purpose, as provided in the act intended to be amended. The act of 1835, c 13, § 4, provides, that each and every keeper of a tavern or house of public entertainment shall pay annually a tax of five dollars, with a proviso, that such license shall not authorise the retailing of spirituous liquors, unless such privilege is mention *250 ed in the license, in which case, twenty-five dollars shall, in addition to the sum of five dollars, be paid for such license.
The act of 1838, c 120, entitled an act, to repeal all laws licensing tippling houses, and for other purposes — provides in section 1st, that the act of 1831, c SO, and so much of the fourth section of the act of 1835, c 13, as relates to the licensing and increasing the tax on those who retail spirituous liquors, be, and the same are hereby repealed. It also provides in section second, that all persons hereafter convicted of the offence of retailing spirituous liquors shall be fined at the discretion of the court, as in other cases of misdemeanor.
Upon this review of the statutes, the first thing that strikes us, as worthy of remark is, that from the year 1779, up to year 1831, in all laws passed upon the subject of retailing spirituous liquors, there appears to be an anxiety, which increased upon every action by the legislature to confine the privilege to persons of probity and trust, and who from being engaged in a laudable and necessary calling, requiring both industry and capital in order to be conducted with success, it was supposed would have every inducement not to abuse the dangerous privilege entrusted to them. The act of 1779 confined the privilege to persons who had obtained a license to keep an ordinary. This was found not to be sufficient to control within proper limits the evils resulting from retailing spirituous liquors. The act of 1811, confined the privilege to .those whom the county court, upon examination, should be satisfied were of sufficient probity, and not addicted to any gross immorality. This was found not to be suffix cient for the purpose designed, and the legislature being determined to find a remedy for the evil, passed the act of J823, by which the privilege was confined to those, who could, by creditable witnesses, show that they were of good moral character; that they were provided with bedding, stables and house room, for the accommodation of lodgers and travellers, to wit, that their design was in good faith to keep a house of public entertainment; and to ensure this, the court was prohibited from granting the privilege, if, in its opinion, *251 the retailing of spirituous liquors, was the principal object in asking a license.
The next thing that strikes us as worthy of remark, is, that in 1831, some eight years after the passage of the act of 1823, the whole policy of legislative enactment upon this subject appears to have been changed; instead of the restrictions of occupation and character, which had heretofore been thought of such vital importance in the granting of a privilege so liable to abuse in unworthy hands; it appears, that nothing thenceforth was to be taken into consideration, but the ability to pay a tax of iwenty-five dollars. Whence, it may be asked, did this great and sudden change take place? The reason is to be found in the history of the country. It had been ascertained by experience, that restrictions which had been previously created, and which it had been believed were of such a character as would control, and keep within proper limits this dangerous privilege, had been totally disregarded by those to whom the power of granting it had been entrusted; and it was hastily thought, that no greater evil would result from increasing the tax, and making the privilege common to all persons.
The next thing that strikes us as worthy of remark, is, that it was found necessary, in the year 1832, the first year after the passage of the act of 1831, to begin to put restrictions on its operations, by compelling all persons, before obtaining a license to retail spirits, to take an oath, that they would not retail any spirituous liquors to anj' slave, nor permit the same to be done, unless by the written permission of the master or overseer. In the year 1835, it was found necessary to continue the restrictions by an additional oath, that they would not knowingly permit nor allow any gaming for whiskey, wine, money, or any other thing to drink or eat, or other valuable thing, in the house in which the spirits were retailed, or on the premises. And that if any such betting or gaming should take place within their knowledge, that they would give information thereof to the grand jury of the next circuit court, and also to inflict the pains and penalties of perjury upon all those who might violate this oath; and finally, it was found necessary to pass the act of 1838, which is en *252 titled as has been seen, an act to repeal all laws licensing tippling houses.
Now what is the legitimate conclusion from this view of the subject? That inasmuch as the legislature had tried to obviate the evils resulting from the license to retail spirituous liquors by the restrictions of character and occupation, until it was found to be of no avail; that having then extended the right, without restriction to every person, until it was found at the expiration of one short year, that they were again compelled to resort to them; and that finding at last that oaths and obligations could not remove the dangers and difficulties arising from the passage of the act of 1831, it was deemed expedient to put a stop to the practice of retailing spirituous liquors altogether. That this is the correct view of the subject, the history of the country also proves. It is not contended that this view of the case is conclusive, though we think it entitled to much weight, and the more especially, if there be doubt in the construction of the statutes referred to upon this subject.
We will now proceed to examine the grounds upon which the defence in this case is made to rest. 1st. It is said, that the act of 1838, c 120, only repeals the act oí 1831, c 80, which authorised every person, upon the payment of twenty-five dollars, to procure a license to retail spirituous liquors, and so much of the fourth section of the act of 1835, c 13, as required the keeper of an ordinary in addition to his tax of five dollars for such license, also to pay twenty-five dollars additional tax for the privilege of retailing spirituous liquors. And that the necessary consequence is, that inasmuch as these statutes operated as a repeal of the acts of 1S11, c 13, and 1823, c 33, their repeal again sets up the acts of 1811 and 1823. To this objection it is answered, first, that though it may be true, that the act of 1838 only repeals the act of 1831 and part of the act of 1835, yet, neither the act of 1811 nor 1823 can be setup thereby; because the acts of 1811 and 1823 are also repealed by the act of 1832, c 34, which is not repealed by the act of 1838, and this upon the principle of the construction of statutes, that when two statutes repeal another, a repeal of one of the re *253 pealing statutes will not again set up the statute repealed. We recognise the correctness of the legal principle, and the only question then is, whether the act of 1832, is a repeal of the acts of 1811 and 1S23. We think it is. We have seen, that by the provisions of the acts of 1811 and 1823, persons who obtained a license to keep an ordinary, might retail spirituous liquors. By the provisions of the act of 1831, any persons wishing to retail spirituous liquors were authorised to apply for a license for that purpose, (not.for the purpose of keeping an ordinary,) and were entitled thereto upon the payment of twenty-five dollars. By the act of 1832, the keeper of a public house is prohibited from selling spirituous liquors by retail, unless he shall first obtain a license for that purpose, under the provisions of the act of 1831. Now this of necessity is a repeal of that portion of the statutes of 1811 and 1S23, which authorises the keeper of an ordinary or public house to retail spirits. By these statutes all that was necessary was to procure a license to keep an ordinary, and the right to retail spirits followed as a consequence; hut by the act of 1832, although the ordinary license be procured, yet the consequence is excluded, unless a special license therefor be obtained, under the act of 1831; this act being repealed, no such license can now be procured, and the consequence cannot attach to the keeping of an ordinary under the repealed statutes of 1811 and 1823.
2. This objection is also met by the answer, that the act of 1838, c 120, does operate virtually as a repeal of all laws authorising a license to retail spirituous liquors, because, by the provisions of the second section it is made a misdemean- or to retail spirits, punishable by fine, at the discretion of the court, as in case of other misdemeanor. We have seen that the wording of this section is, that “all persons convicted of the offence of retailing spirituous liquors shall be fined,” &c. This, it is contended, cieates no new offence, but only refers to one created before, viz., the retailing of spiritous liquors without a license; that if the acts of 1811 and 1823, the laws authorising a license to be issued have been repealed, then we have nothing by which the offence can be *254 defined, as the repealed statutes cannot be referred to for that purpose.
We do not recognise the correctness of this principle, but hold, that when it may become necessary to refer to a repealed statute, in order to define correctly an existing offence, it may well be done, but if this were not so, it could avail the defence nothing, for the statutes of 1811 and 1823 do not either of them define what retailing spirituous liquors is. It is true, that the act of 1811 makes it indictable to do so, without a license, under the restrictions there created, and the act of 1823 does the same. But when we wish to ascertain what retailing is, we are under the necessity of referring to the act of 1779, c 10, where it is defined to be, the setting of any quantity less than a quart without license, or any greater quantity, if to he drank at the place where sold; and subjects persons guilty of so doing to a penalty of one hundred and twenty-five dollars. This statute is not repealed by the act of 1838, c 120, at least so far as it inflicts the penalty upon all persons who may sell by a greater quantity than the quart, intended to be drank at the place where sold, which penalty this court, in the case of Moore vs. The State, 9 Yer. 353, held to be inflicted by the 12th section of said statute. The offence of retailing spirituous liquors, then, was created by the act of 1779, c 10, and subjected persons guilty thereof to a penalty; it was made indictable by the acts of 1811 and 1823, provided a license for that purpose was not obtained, and it is made indictable by the act of 1838, without any exception in favor of a license. But, as has been said, if there were doubt as to the construction which should be given to this statute upon its wordings, we could have recourse to information derived from the history of the country as to the evil intended to be remedied, for the purpose of aiding us in giving the correct construction; we could also call to our aid for the same purpose the title to the act. When all these principles are conbined, they form a case of entire prohibition to retail spirituous liquor, so strong, that it is impossible to assail it with any hope of success.
2. It is said in defence, that Dyer, on the morning of the *255 27th of January, 1838, applied to the clerk of the county court of Davidson, for a license to retail spirituous liquors, which was refused, although there was then no law in existence prohibiting it. The act of 1838, c 120, had passed both Houses of the Legislature on the 26th of January, 1838, but was not signed by the speakers till the evening of the 27th. And it is contended, that the act had no validity till this was done, and therefore could not have taken effect at a period anterior thereto.
Note. Statutes take effect upon the most remote and secluded portions of the State, from the time of their passage, not allowing a single moment for gain ing intelligence of their passage: — a principle of law destitute of every semblance of reason, and fraught with hardship and severity. It is not quite so bad, however, as the old English rule — by which, if no period was fixed by the statute itself, it took effect, by relation, from the first day of the session in which the act was passed. This rule was abolished by an act ot 33 Geo. III—1793— by which j-tatutes are to have effect only from the time they receive the royal assent. The settled principle of American law is declared by Marshall, C. J., in Matthews vs. Jane, 5 Cond. R. 270, to be, “that a statute, for the commencement of which, no time is fixed, commences from its date;” the constitutional prohibition of ex post facto and retrospective laws having annulled the ancient rule of the common law. The statutes of the United States take effect from the day of their appproval by the President, that being the day of their date. The same rule, of course, applies to the statutes of those States in which the executive is so far a branckfof the legislative department, as that his concurrence in its acts are necessary to their perfection. But in those states where bills, which have passed the houses, become laws when signed by the speakeis, and not until then, it would seem to be giving them a retroactive effect, to make them relate to the day of their passing the houses.
*255 It is true, that it is provided by the eighteenth section of of the 11th article oi the Constitution of the State of Tennessee, that “no bill shall become a law until it shall be read and passed on three different days in each house, and be signed by the respective speakers.” But when this has been done, we think the law takes effect from the date of its passage by relation. The duties to be performed by the speakers in signing the statutes is not of a legislative, but ministerial character. And to cause the operation of a law to depend upon the period of time when this duty was performed, would introduce too great uncertainty in the administration of justice, as there would be nothing but the memory of man to resort to for the purpose of ascertaining it. — The signature not being dated, and there being no record of the time kept.
But wo also think that the refusal of a clerk to issue a license to retail spirituous liquors under the provisions of the act of 1831, even if it had been in force, would not have authorised the plaintiff in error to retail as if he had procured one. It is the possession of the license, not the application, which gives the right; and the only remedy, in the case of a refusal, would be against the clerk, either by an action on the case, or by mandamus.
We are therefore of opinion, that there is no error in the proceedings of the court below, and affirm the judgment.
In New York, every law, unless a different time be presciibed therein, takes effect throughout the state, on, and not before the 20th day after its final passage. 1 Kent’s Comm, 454, 3d Ed. This, or some similar rule ought to be adopted in every state in the Union. See 1 Gallison, 62, case of the Brig Ann; 1 Kent’s Com. 454, 3d Ed.; Dwarris on Statutes. 682, et seq.