NEW YORK COUNTY.—HON. D. G. ROLLINS, SURROGATE.—June, 1887.

MATTER OF CHARDAVOYNE.

MATTER OF MATTSON.

*In the matter of the estate of* GEORGE M. CHARDAVOYNE, *deceased.*

*In the matter of the estate of* MORRIS MATTSON, *deceased.*

The time of *the passage* of an act of the legislature, approved by the executive, is the day when it receives such approval, as certified by the secretary of State.

As to whether the statute, L. 1885, ch. 483, entitled "an act to tax gifts, legacies and collateral inheritances in certain cases," *commenced and took effect* on the day of its passage, or on the twentieth day thereafter—*quære.*

Words of a statute should not be treated as surplusage, if, upon any fair and reasonable construction, they are found to serve an intelligible purpose.

The opening clause of the first section of the act cited, viz. : "after the passage of this act," is grammatically related to the word "pass" or "die," in that section occurring ; and is operative to subject to taxation property passing, in the manner specified, to one not exempt, from an owner dying after June 10th, 1885.

SUSAN M. JOURNEAY and Joseph B. Lockwood, the administrators of the estate of George M. Chardavoyne, deceased, filed a petition, setting forth that, pursuant to a decree judicially settling their account, they had caused the property of the estate to be appraised at its fair market value, and made distribution among the persons entitled thereto, retaining, however, in their hands, sufficient funds to pay the tax imposed by L. 1885, ch. 483, in case it should be determined that such tax was due and payable ; and praying that the court determine whether or not that act had any application to decedent's estate, and for a citation to the nephews and nieces of decedent, the comptroller of the city, and the district attorney of the county of New York.

HENRY N. TIFT, *for petitioners.*

GRANVILLE P. HAWES, *for next of kin.*

R. B. MARTINE, *district attorney.*

---

FRANCIS B. COOLEY and Roland Mather, executors of the will of Morris Mattson, deceased, filed a petition, setting forth that an appraisal had been had,

under the act of 1885 (ch. 483), in respect of their decedent's estate ; that a. question had arisen as to whether the legacies bequeathed by the will were liable to the tax by that act imposed, and praying for a citation directed to the comptroller and the district attorney of the county of New York, and to a corporation, legatee, to show cause why the tax should not be paid, or the estate relieved therefrom.

KELLY & MACRAE, *for executors.*

EDWARD C. CHRISTIE, *for legatee.*

THE SURROGATE.—At the times of their respective deaths these decedents were residents of the city of New York. The former died intestate on June 13th, 1885, leaving as his surviving next of kin two sisters and several nephews and nieces. The latter left a will, admitted to probate on July 30th, 1885, whereby legacies are bequeathed to divers beneficiaries, including certain persons strangers to his blood. I am now to determine whether any portion of either of these estates is liable to taxation under the act of the legislature of 1885, entitled "An act to tax gifts, legacies and collateral inheritances."

The claim of non-liability rests, as regards both estates alike, upon the contention that that act applies to the estates of such persons, and of such persons only, as have died since June 30th, 1885. Mr. Chardavoyne died on June 13th of that year, and Mattson on the day following. On June 10th, 1885, the bill which now appears as chapter 483 of the statutes of that year, having been duly passed by both Houses of the legislature, was presented to the Governor, and

was by him approved.   The certificate of his appro-
bation was indorsed thereon, and the bill so indorsed
was delivered to the Secretary of State, pursuant to
art. 4, sec. 9 of the Constitution of this State, and sec.
4, tit. 4, ch. 7, part 1, of the Revised Statutes (1 Banks,
7th ed., 432).   It was then, pursuant to § 10 of the
same title, deposited in the office of the Secretary of
State, who proceeded as directed by § 11, to certify
and indorse thereon "June 10th, 1885," as the day,
month and year when it " became a law."

It is provided by § 12 that " every law, *unless a
different time shall be prescribed therein*, shall com-
mence and take effect ·on, and not before, the twen-
tieth day after its final passage."   It follows, there-
fore, that unless chapter 483 prescribes some different
date than June 30th, 1885, as the date of its com-
mencement and taking effect, it commenced and took
effect on that day and not sooner.

The district attorney of this county, who has ap-
peared in these proceedings in accordance with § 17
of the act here in question, contends that the estates
of these decedents, which, but for the provisions of
that act would have passed by the Statutes of Descent
and Distribution to Mr. Chardavoyne's heirs and next
of kin, and to Mr. Mattson's legatees and devisees, are
liable to the tax by that act imposed, except so far as
by its express terms certain portions of those estates
are exempted from such liability.   He insists, in other
words, that chapter 483 took effect from the date of
its enactment, and not from the twentieth day there-
after.

The first section of the act is in these words:

" *After the passage of this act,* all property which shall pass by will or by the intestate laws of this State from any person who may die seized or possessed of the same while being a resident of the State, or which property shall be within this State . . . to any person or persons, or to a body politic or corporate, in trust or otherwise . . . other than to or for the use of father, mother, husband, wife, children, brother and sister, and lineal descendants born in lawful wedlock, and the wife or widow of a son and the husband of a daughter, and the societies, corporations and institutions now exempted by law from taxation, shall be and is subject to a tax of $5 on every $100 of the clear market value of such property, and at and after the same rate for any less amount, to be paid . . . in the city and county of New York to the comptroller thereof for the use of the State."

The first six words of the section above quoted are admittedly the only words that are calculated to take the act which I am here interpreting from out the operation of § 12, title 4, chap. 7, part 1 of the Revised Statutes (*supra*).

Now, in ascertaining and determining whether those six words have the effect which is claimed for them by the district attorney, it must be borne in mind that the Constitution of this State puts no restriction whatever upon the authority of the legislature to make immediately effective all statutes which it may lawfully enact.

Counsel who are contending for the non-liability of these two estates under the so-called Collateral Inheritance act, must certainly concede that, but for the

existence upon the statute book of § 12, *supra*, that act would have gone into operation on the date of its approval by the Governor, and that, too, even though the first six words of its first section formed no part of its provisions.

Prior to the enactment in Great Britain of the act of 33 George III, ch. 13, entitled "An act to prevent acts of Parliament from taking effect prior to the passing thereof," statutes became operative by relation from the first day of the session of the Parliament that had enacted them (4 *Coke Inst.*, 25 ; Panter v. The Attorney-General, 6 *Bro. Par. Rep.*, 486 ; Latless v. Patten, 4 *T. R.*, 660).

This doctrine, which, according to the express avowal of the act of 1793, had been productive of "gross and manifest injustice," had sprung from the fact that in the rolls of Parliament, made up after its adjournment, it had not been the custom to name any date except the date when that Parliament had assembled, and that, in fixing the time when statutes took effect, the courts had been furnished with no other guide than those rolls afforded. The statute of 1793 provided that there should thereafter be indorsed upon every act the day, month and year when the same should "pass and receive the royal assent," and that such indorsement should be taken to be a part of such act, and to be the date of its commencement where no other commencement should be therein provided. This rule has ever since prevailed in England. A like rule has obtained as regards national legislation in our own country. The Constitution of the United States is silent upon the subject,

and the Congress has never, I think, undertaken to regulate it by any general provision (The Brig Ann, 1 *Gallison,* 62; Matthews v. Zane, 7 *Wheat.,* 164; Warren M'f'g Co. v. Etna Ins. Co., 2 *Paine,* 501).

As regards the separate States of the American Union, there has been great diversity of action. In some of them, there are constitutional restraints more or less stringent upon legislative authority. In Maryland no law takes effect until the first day of June next after the session at which it has passed, " unless it be otherwise expressly declared therein " (Const. 1867, art. 3, § 31). There are similar provisions in the Constitution of Michigan (Const. of 1850, art. 4. § 20), and of West Virginia (Const. 1872, art. 6, § 30).

In Illinois, a law is inoperative until the first day of July next after its passage, " unless, in case of emergency, which emergency shall be expressed in the preamble or body of the act, the General Assembly shall otherwise direct "(Const. 1870, art. 4, § 13).

Similar restrictions are found in the fundamental laws of Colorado (Const. 1870, art. 5, § 19), of Missouri (Const. 1875, art. 4, § 36), of Nebraska (Const. 1875, art. 3, § 24), of Oregon (Const. 1857, art. 4, § 28), of Tennessee (Const. 1870, art. 2, § 20) and of Texas (Const. 1876, art. 3, § 39).

By the Constitution of Iowa, no law passed at a regular session takes effect until the fourth day of July next after its passage, unless the General Assembly " shall deem the law of immediate importance," in which event they may " provide for its taking effect by publication" (Const. of Iowa, 1857, art. 3, § 26).

In Indiana, no act can become operative until it has been "published and circulated by authority, except in case of emergency, which emergency shall be declared in the preamble or the body of the law" (Const. of Ind., 1851, art. 4, § 28).

In Kansas and in Wisconsin no law of a general nature goes into effect until it has been published (Const. of Kan., 1859, art. 2, § 19; Const. of Wis., 1848, art. 7, § 21).

In several of the States, there is no constitutional restriction and no general legislative provision in the premises. Massachusetts, Maine, Connecticut, California, Minnesota, Nevada, New Jersey, New Hampshire, Georgia, North Carolina, Ohio, Rhode Island, Vermont and Virginia are without constitutional limitations upon the power of the legislature, but in each of those States there is a general statute, in terms not unlike our own, providing for the contingency of a failure on the part of the lawmaking power to indicate, with respect to any particular piece of legislation, the time of its going into operation.

Now, since § 12 (*supra*) came upon the statute book, it has been a frequent and well-nigh universal custom of the legislature to signify its intention that a law should go into immediate operation by a special section so declaring in express terms. Of the 557 statutes enacted in 1885 over 500 contain a section of that character. It must nevertheless be kept in mind that the legislature, unfettered as it is by constitutional restraints, is not bound to adopt this particular mode for making its laws effective from the date of their passage, but may accomplish that

result by adopting any form of words satisfactorily evincing that such is its purpose.

Some of the counsel in this proceeding lay great stress upon the word "prescribed" in section 12 (*supra*), as if the legislature which enacted the Revised Statutes had by the use of that term put its successors under some species of restraint. But a legislative act cannot be insured against repeal, not even against repeal by implication.

"The later Parliament," says Lord COKE (1 Inst., 42, 43), "hath ever power to abrogate, suspend, qualify, explain or make void the former, in the whole or any part thereof, notwithstanding any words of restraint, prohibition or penalty."

Whether the Collateral Inheritance law took effect on the day when it was approved by the Governor, or did not take effect until a later period, is purely a question of the intention of the legislature which enacted it, as that intention can be gathered from its language. If that language fairly construed discovers a purpose of the law-makers that the act should become immediately operative, there is an end of the matter.

Now, what is the fair construction of the expression, "After the passing of this act," which stands at the very threshold of chap. 483 ? If that expression is considered quite apart from any supposed aid to its interpretation that may be afforded by reference to section 12, *ante*, it cannot be even plausibly contended that it means anything else than this : After the enactment of this bill into a law—after this bill shall

have become a statute of the State, in some one of the modes established by the Constitution.

One who claims that " the passing of this act," as used in section 1, is equivalent in meaning to " the going into operation of this act," must resort of course to the general statutory provision heretofore quoted, to find the date to which, in his view, those expressions alike refer.  He there finds that " every law unless, etc., etc., shall commence and take effect on and not before the twentieth day *after the day of its final passage.*"

The force of the word " passage," under *these* surroundings, is quite unmistakable.  And it is equally unmistakable that the meaning which must there be assigned to it is of necessity the very meaning which it has in chapter 483.  The contestants' argument ends, therefore, in a *reductio ad absurdum.*

I see no room for doubting that the first section of chapter 483 must be interpreted precisely as if there appeared therein, in place of the words " after the passing of this act," the words " after *June* 10th, 1885."

*Second.* But it is claimed that section 1, even as thus paraphrased, fails to indicate an intention on the part of the legislature that the act of which it forms a part should become at once operative.

The word " after," it is urged, lacks definiteness and exactitude : It does not mean " from and after " or " immediately after," or " at all times after ;" and there is, therefore, still a necessity of resorting to § 12 of the General Law to find the precise period

when the passing of decedents' estates becomes taxable under chapter 483.

· I have been referred to no reported decisions which seem to me to lend strong support to this contention. The cases relied upon by counsel are Wheeler v. Chubbuck (16 *Ill.*, 361); Board of Supervisors v. Keady (34 *Ill.*, 293); Rice v. Ruddiman (10 *Mich.*, 125), and Charless v. Lamberson (1 *Clarke, Iowa*, 436).

Wheeler v. Chubbuck was an action brought to recover from the defendant a penalty for suffering hogs to run at large, contrary to a statute of Illinois which was passed on January 27th, 1853. The statute declared that "from and after the first day of March *next*, it shall not be lawful," etc. A verdict was recovered against the defendant in the trial court, after a charge of the presiding justice that if the defendant had violated the statute at any time after March 1st, 1853, the plaintiff could recover. It was claimed by the appellants that the "March *next*" of the statute must be held to mean. March, 1854, in view of art. 3, § 3, of the then existing Constitution of the State, which declared that "no public act of the General Assembly shall take effect or be in force until the expiration of sixty days from the end of the session at which the same may be passed, unless in case of emergency the General Assembly shall otherwise direct." This contention was sustained on appeal, the Supreme court holding that the legislature had not declared the existence of an emergency, and had not given the direction, without which, under the Constitution, *no* public act could take effect in thirty-one days after its passage. Board of Supervisors v.

Keady is a reiteration of the same doctrine upon an essentially similar state of facts.

In Rice v. Ruddiman it was held that the legislature of Michigan, by a statute passed February 4th, 1859, providing for an election of county officers " at the annual township meeting to be held in April *next*," must be deemed to have intended that such election should take place in April, 1860, in view of the fact that the 1859 session of the legislature continued until May 16th, and that the Constitution of the State provided that no act, passed as was the act there in question, by less than a two thirds vote, could go into operation until ninety days after the close of the legislature that had enacted it.

The suit of Charless v. Lamberson, grew out of the following state of facts : The act known as the Code of Iowa was passed in February, 1851. Its 1249th section declared that a homestead might be sold on execution for debts contracted " prior to the passage of this law." It was held by the Supreme court that the section applied to debts contracted in April, 1851, or contracted at any subsequent period prior to July 1st, 1851, the day on which the Code took effect.

At first blush this decision seems apposite to the present situation. But the conclusion of the court was mainly based upon these two considerations, which are foreign to the case at bar : *First*—The State Constitution provided that no general law should take effect until it had first been published and circulated by authority, and the legislature in pursuance of that provision had caused publication to be made declaring that the Code should become operative on July 1st,

1851, and not sooner. *Second*—One of the sections of the Code expressly provided that the terms "heretofore" and "hereafter," wherever they might appear, should be treated as relating to the time when the statute should take effect. Under these circumstances the court was of the opinion that the term "prior to the passage of this act" was substantially equivalent to the term "heretofore," and covered all periods of time preceding July 1st, 1851, the date on which the act became operative.

While the cases upon which I have above commented can, as it seems to me, be readily and clearly distinguished from the case at bar, the claim that the expression "after the passage of this act" is not sufficiently definite to establish the very day of the act's passing as the day of its going into operation has been so forcibly presented, that I might feel constrained to pronounce these two estates exempt from taxation but for a consideration which I now proceed to state.

Suppose it to be conceded that the words in controversy do not have the effect claimed for them by the district attorney, it by no means follows that those words are meaningless, nor indeed that, for the practical purposes of this proceeding, they may not be utterly fatal to the contestants' claim of exemption.

Why has the legislature made use of them? They are surely not to be tossed aside as mere surplusage, if upon any fair and reasonable construction of the statute, they are found to serve an intelligent purpose.

According to the contestants, they have no force or value whatever. Strike them from the statute and its meaning is not altered a whit. Now, I cannot assent

to this view.   The preposition " after " expresses the relation between the word " passage " and some other word in the sentence wherein it appears.   What is that word ?   Manifestly, it is either the word " pass " or the word " die."   The tax for which the first section of the act provides is imposed upon all property which shall PASS after the passage of this act from a person who may die, etc., or upon all property which shall pass from any person who may DIE after the passage of this act.   The two propositions are in substance the same.

Now, let it be admitted that this law did not " commence and take effect" until June 30th, 1887.   Not until that date, upon this assumption, could the Surrogate   appoint   appraisers ; not until then could he exercise the jurisdiction granted by section 13 ; not until then could he issue the citation for which section 16 makes provision.   But the question still remains : To what estates was the act found to be applicable when it finally became operative ?   To the estates, it seems to me, of all persons who had died *at any time after its passage,* being " seized or possessed," etc., etc., as specified in the statute.   This reading clears up the obscurity of the phraseology, assigns an intelligible and important meaning to words which the contestants can only deal with by pronouncing them surplusage, and is in accord with a recent well considered decision of the English Court of Appeal in *ex parte* Rashleigh (*L. R.,* 2 *Ch. Div.,* 9)—a decision which is so pertinent to the present situation that it seems proper to state in some detail the circumstances under which it was rendered.   The " Bankruptcy Act,

1861," by which non traders were first made liable to
the bankruptcy laws of England, provided by its 90th
section that, as respected such non traders, the debt
of the petitioning creditor must be a debt contracted
"after the passing of this act." Section 232 declared
that, as to the appointment of certain officers, the act
should "commence and take effect from and after the
passage thereof," and that "as to all other matters
and things," it should take effect "from and after the
11th day of October, 1861." The statute received
the royal assent on August 6th, 1861. It was subse-
quently repealed and another was substituted in its
place. One of the sections of the new act (§ 118),
provided that a non trader should not be adjudged a
bankrupt in respect of a debt contracted *"before the
date of the passing* of the Bankruptcy Act, 1861."

It was held by the court below that a debt con-
tracted in September, 1861, *i. e.,* between the date
when the act of 1861 received the approval of the
Sovereign and the date when that act went into oper-
ation, must be held to have been contracted *before*
and not *after* its passage—in other words that the
term "the passing of the act," as used in section 118,
should be construed as meaning "the taking effect
of the act." This judgment was reversed by the
Court of Appeals with the concurrence of the four sit-
ting judges, each of whom pronounced an opinion.
It was held that the words "passing of the bank-
ruptcy act, 1861," in § 118, *supra,* referred to the
time when that act received the royal assent and not
to the time when it went into operation.

Said JAMES, L. J.: "I am of opinion that the

words ' the date of the passing of the Bankruptcy act, 1861,' mean what they say.    They are English words, common words and words which have a fixed meaning in our language and law.    They mean the time when the royal assent is given to a bill which has passed both houses of Parliament.    That is the meaning of the words, and no court ought to depart from the plain meaning of plain English words unless coerced to do so by some very serious injustice."

MELLISH, L. J., said :    " I am of the same opinion. The 118th section appears to me a perfectly easy section to construe, and the words must be taken in their natural sense. . . . . The 232d section says that the act shall commence and take effect from and after the 11th day of October, 1861.    *That means that nothing which is authorized to be done under that act can be done till after the 11th day of October ; but that is all it says.*    It follows that the 90th section is so far modified that no creditor could present his petition until after the 11th day of October, 1861 ; neither could a judgment debtors' summons be taken out until after the 11th of October, 1861, because the presenting of a petition in bankruptcy, or the taking out of a judgment debtors' summons, would be *something done* under the act.    But to my mind it does not follow that nothing may then be done *in respect of any debt incurred after the passing of the act,* nor does it follow that the words ' after the passing of this act ' are not to be read in their natural significance."

BAGALLEY, J., and BRETT, J., each announced his full concurrence in the views of his associates.    The latter said, among other things :    " I think the canon

of construction here is that you must construe the 118th section according to its ordinary grammatical terms unless such construction would produce either an absurdity or a great injustice, so that it must be inferred that the Legislature did not mean to use the words in the ordinary sense."

It seems to me that the facts of the case just cited were much more favorable to the unsuccessful parties than are the facts in the present case to these objectors.   The two cases would be more nearly parallel if in our act of 1885 there had been inserted, for example, a concluding section in these words:   "This act shall take effect on the twentieth day after its passage."   Even in that event it would seem to have been necessary, in order to give any effect whatever to the first six words of the statute, to hold the property of persons dying between June 10th and June 30th, no less than the property of persons dying after the latter date, subject to the burdens by the statute imposed.

My conclusion is that the estates of both these decedents are liable to the tax.   Let a decree be entered accordingly.