# Legal Issues Raised by Proposed Presidential Proclamation To Extend the Territorial Sea

The President has the authority to issue a proclamation extending the jurisdiction of the United States over the territorial sea from three to twelve miles out.

The President also has the authority to assert the United States's sovereignty over the extended territorial sea, although most such claims in the nation's history have been executed by treaty.

There is a serious question whether Congress has the authority either to assert jurisdiction over an expanded territorial sea for purposes of international law or to assert the United States's sovereignty over it.

The domestic law effect on federal statutes of the extension of the territorial sea is to be determined by examining Congress's intent in enacting each affected statute.

The extension of the territorial sea will not affect the Coastal Zone Management Act.

October 4, 1988

MEMORANDUM OPINION FOR THE LEGAL ADVISER
DEPARTMENT OF STATE

## Introduction and Summary

This responds to the requests, made by your Office and an inter-agency working group, for analysis of the constitutional and statutory questions raised by a proposed presidential proclamation to extend the territorial sea of the United States from its present breadth of three miles to twelve miles.[1] In particular, we have been asked to address the following questions: First, does the President have the authority to declare, by presidential proclamation, the proposed extension? Second, assuming the President does have the authority, what effect would such a proclamation have on domestic legislation, such as the Coastal Zone Management Act? Third, can the President limit the effect the proclamation will have on domestic legislation? We have also been asked to comment on H.R. 5069, a bill that would extend the territorial sea by legislation.

We conclude that the President can extend the territorial sea from three to twelve miles by proclamation. While the most legally secure method of doing so would be by entering into a treaty with other nations on this issue, we believe that the President may extend the territorial sea by virtue of his constitutional role

---

[1] Letter for Douglas W. Kmiec, Acting Assistant Attorney General, Office of Legal Counsel, from Michael J. Matheson, Acting Legal Adviser (Aug. 15, 1988). *See also* Memorandum for Michael A. Carvin, Deputy Assistant Attorney General, Office of Legal Counsel, from Kevin R. Jones, Deputy Assistant Attorney General, Office of Legal Policy (June 20, 1988) (raising similar questions on behalf of the inter-agency working group).

as the representative of the United States in foreign relations. The President's foreign relations authority under the Constitution clearly permits his unilateral assertion on behalf of the United States of jurisdiction over the territorial sea. Whether the President may individually assert sovereignty over the territorial sea is open to some question, although on the basis of several long-settled, historical examples of Presidents unilaterally claiming territory in this fashion, we believe that he may. Finally, we conclude that while Congress may establish state boundaries, there is a serious question whether it has the constitutional authority either to assert jurisdiction over an expanded territorial sea for international law purposes or to assert sovereignty over it.

With respect to the statutory issues, we believe that the better view is that the expansion of the territorial sea will not extend the coverage of the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451–1464, the statute that has been identified to us by the inter-agency working group as being of special concern. It must be acknowledged, however, that the effect of the proclamation on the CZMA is not entirely free from doubt and that the effect of the expansion on other federal statutes raises complex questions. We therefore recommend that the President seek legislation stating that federal statutes that rely upon the concept of the territorial sea are not affected by the President's proclamation extending the territorial sea from three miles to twelve miles.

## Analysis

### I. The Territorial Sea

In order to understand the legal issues raised by the proposal to extend the territorial sea, we begin by examining three concepts: the meaning of the "territorial sea" as that term is used in international law; the nature of the other areas of the sea over which a nation may assert some control under international law; and, finally, the distinction between a claim of sovereignty over the territorial sea and claims of jurisdiction over other areas of the sea.

The territorial sea is the belt of water immediately adjacent to the coast of a nation. *See, e.g.*, Restatement (Third) of The Foreign Relations Law of the United States § 511(a)(1986) ("Restatement Third"); 1 L. Oppenheim, *International Law* § 172, at 416 (H. Lauterpacht ed., 7th ed. 1948) ("Oppenheim"). The territorial sea extends from the nation's coast to a distance of up to twelve miles from the coast, the maximum breadth now permitted by international law. Restatement Third § 511(a). Although the United States and some other nations continue to follow the historical practice of adhering to a three-mile territorial sea, most nations now assert sovereignty over a twelve-mile territorial sea.[2]

---

[2] "At the time this country won its independence from England there was no settled international custom or understanding among nations that each nation owned a three-mile water belt along its borders." *United States v. California,* 332 U.S. 19, 32 (1947). By the beginning of the nineteenth century it was generally agreed that the territorial sea extended as far as a cannon could shoot: three miles. *See The Ann,* 1 F. Cas. 926 (C.C.D. Mass. 1812)

A nation is sovereign in its territorial sea. *See* Convention on the Territorial Sea, pt. I, art. 1, 15 U.S.T. at 1608.[3] Indeed, a nation has the same sovereignty over the territorial sea as it has over its land territory. *See* Restatement Third § 512 (sovereignty is the same over the territorial sea as it is over land territory); *Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 234 (1804) (Marshall, C.J.) (a nation exercises absolute and exclusive authority within its own territory, including the territorial sea); *The Ann*, 1 F. Cas. 926, 927 (C.C.D. Mass. 1812) (No. 397) (Story, J.) (the territorial waters "are considered as a part of the territory of the sovereign").[4]

By contrast, a nation is not sovereign over the high seas, which are the remainder of the ocean beyond the territorial sea,[5] and include areas such as the contiguous zone, the continental shelf, and the Exclusive Economic Zone ("EEZ").[6] Rather, a nation may assert more limited forms of jurisdiction in such areas. In the contiguous zone, for example, a nation may only exercise control incident to the application of its customs, fiscal, immigration, and sanitary regulations in the territorial sea. Convention on the Territorial Sea, pt. II, art. 24 (1),

---

[2] (. . . continued)

(No. 397) (Story, J.). *See generally* Sayre A. Swarztrauber, *The Three-Mile Limit of Territorial Seas* 23–35 (1972) (describing the history of the cannon-shot rule) ("Swarztrauber"). In the twentieth century, however, the international agreement on the three-mile territorial sea collapsed. Swarztrauber, *supra*, at 131–251. The 1958 Convention on the Territorial Sea and the Contiguous Zone ("Convention on the Territorial Sea"), Apr 29, 1958, pt I, art. 3, 15 U.S.T. 1607, 1608, failed to establish an accepted limitation on the extent of the territorial sea One hundred four nations now claim a twelve-mile territorial sea, while only thirteen maintain the three-mile limit. U.S. Dep't of State, *Summary of Territorial Sea, Fishery, and Economic Zone Claims* 1 (1988)

[3] The Convention on the Territorial Sea, to which both the United States and the Soviet Union are parties, provides, "[t]he *sovereignty* of a State extends, beyond its land territory and its internal waters, to a belt of sea adjacent to its coast, described as the territorial sea." Convention on the Territorial Sea, pt. I, art. 1, 15 U.S.T. at 1608 (emphasis added). The character of the territorial sea as territory in the same sense that land is territory has not always been free from doubt. *See United States v Louisiana*, 363 U.S. 1, 34 (1960) (Harlan, J.) ("a [maritime] boundary, even if it delimits territorial waters, confers rights more limited than a land boundary"). Similarly, Oppenheim observed in 1937 that "a minority of writers emphatically deny the territorial character of the maritime belt." Oppenheim, *supra*, § 185, at 442–43. These statements, however, have given way to the modern view that a nation exercises the same full sovereignty over its territorial sea as it exercises over its territory on land. Convention on the Territorial Sea, pt. I, art 1, 15 U.S.T. at 1608; Restatement Third § 513(1)(a). The notion that a nation is less than fully sovereign over its territorial sea is now considered archaic. *See* Restatement Third § 512, reporters' note 1.

[4] The only qualification on a nation's sovereignty within its territorial sea is that all ships enjoy a right of innocent passage. Convention on the Territorial Sea, pt. I, art 14(1), 15 U.S.T. at 1610; Restatement Third § 513(1)(a). The right of innocent passage is extended to warships so long as their passage is not prejudicial to the peace, good order, or security of the coastal state. *Id*, pt. I, arts. 14(4), 22, 23, 15 U.S.T. at 1610, 1612. The right of innocent passage also extends to submarines as long as they are navigating on the surface and show their flag. *Id*, pt. I, art. 14(6), 15 U.S.T. at 1610.

[5] The high seas are open to all nations; no nation may claim sovereignty over any part of the high seas Convention on the High Seas, Apr. 29, 1958, art. 2, 13 U.S T. 2313, 2314. Both the United States and the Soviet Union are parties to the Convention on the High Seas.

[6] The contiguous zone is the part of the high seas that borders the territorial sea. Convention on the Territorial Sea, pt. II, art 24(1), 15 U S.T. at 1612, Restatement Third § 511(b). The continental shelf includes the sea-bed and the subsoil of the submarine areas that extend from the coast to the outer edge of the continental margin (or, if the continental margin does not extend so far, to a distance of not more than two hundred miles) Restatement Third § 511(c). The EEZ extends from the coast to no further than two hundred miles from the coast. *Id.* § 511(d).

15 U.S.T. at 1612.[7] A nation's authority over its continental shelf is restricted to the exploration and exploitation of natural resources. Restatement Third § 515(1). A nation's authority within its EEZ is restricted to activities for economic exploration and exploitation, scientific research, and the protection of the environment. *Id.* § 514(1). Outside these areas, a nation has no jurisdiction over the activities of other nations. Convention on the High Seas, Apr. 29, 1958, art. 2, 13 U.S.T. 2313, 2314.

In sum, the United States may exercise full sovereign power within its territorial sea, while exercising more limited kinds of jurisdiction in three overlapping portions of the high seas—the contiguous zone, the continental shelf, and the EEZ.[8]

## II. Constitutional Authority to Extend the Territorial Sea

The question of where the power to extend the territorial sea resides under our constitutional scheme is novel and complex. The Constitution does not discuss the matter and there has been no direct precedent since President Washington first claimed a three-mile territorial sea in 1793. The proposed extension raises issues of the ways in which the United States, through the executive and legislative branches, may acquire territory and assert sovereignty over it, as well as questions about the President's foreign relations power.

With these concerns in mind, we conclude, for the reasons stated below, that the President undoubtedly has the power to assert jurisdiction over the territorial sea so as to establish a new territorial sea for the United States under international

---

[7] The Convention on the Territorial Sea provides that "[t]he contiguous zone may not extend beyond twelve miles from the baseline from which the breadth of the territorial sea is measured." Convention on the Territorial Sea, pt. II, art 24 (2). The proposed proclamation, however, states that "[t]he outer boundary of the contiguous zone of the United States henceforth extends 24 nautical miles from the baselines from which the territorial sea is measured." Although customary international law now permits a nation to claim a contiguous zone up to twenty-four miles from the baselines, *see, e g*, Restatement Third § 511(b), the United States has declined to ratify the Law of the Sea Convention in which this new norm is codified. Therefore, the provision extending the contiguous zone should be deleted from the proclamation.

It may be true that most countries have adopted the new twenty-four mile contiguous zone by ratifying the Law of the Sea Convention or would waive their right to protest such an extension. Nevertheless, such a proclamation would be inconsistent with our treaty obligations if the new contiguous zone were asserted against another party to the 1958 Convention on the Territorial Sea who wished to protest. We have been advised informally by the Department of State that the likelihood of protests is small.

[8] Jessup best explains the difference between sovereignty over the territorial sea and limited jurisdiction over other areas of the sea:

There is a vital distinction between that maritime belt which is claimed as a part of the territory of the state and the limited rights of control or jurisdiction claimed upon the high seas. The confusion is intensified by the disagreement among text writers as to the nature of the control or jurisdiction exercised over territorial waters. If one starts with the proposition that the littoral state has only a "bundle of servitudes" over the territorial waters, one is naturally unable to see much distinction between claims to a three-mile and to a twelve-mile zone. Similarly if one posits merely certain rights of control or jurisdiction therein. But if, on the other hand, one maintains that each maritime state may rightly claim as a part of its territory a certain maritime belt, then the distinction becomes clear. It is this latter hypothesis which is believed to be sound, historically, theoretically and according to international practice.

Phillip C. Jessup, *The Law of Territorial Waters and Maritime Jurisdiction* xxxiii - xxxiv (1927).

law. We also believe, although the issue is not entirely free from doubt, that he has the power to assert sovereignty over the territorial sea as a function of his power to acquire territory on behalf of the United States. Finally, we doubt that Congress has constitutional authority to assert either sovereignty over an extended territorial sea or jurisdiction over it under international law on behalf of the United States.

## A. The President's Power to Assert Jurisdiction

The President's power to assert jurisdiction over the territorial sea is based on his constitutional power over foreign relations.[9] The President's constitutional role as the sole representative of the United States in foreign relations has long been recognized. In the words of John Marshall, "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." 10 Annals of Cong. 613 (1800).[10] Thus, it is not surprising that Justice Sutherland explained the nature of the President's authority in expansive terms:

> In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation.
>
> . . . .
>
> It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution.

---

[9] It is axiomatic that under our Constitution the President has been given broad authority over the conduct of the Nation's foreign relations. *United States v Curtiss-Wright Export Corp.*, 299 U.S. 304, 315–22 (1936). This authority arises from a number of the President's constitutional powers: as Commander-in-Chief of the Nation's military forces, art. II, § 2, cl 1; as the individual charged with the power to negotiate treaties, art. II, § 2, cl. 2; and as the individual who receives ambassadors and other foreign representatives, art. II, § 3. Of course, these specific provisions are supplemented by the general provision of Article II, Section 1, Clause 1, which provides that "[t]he executive power shall be vested in a President of the United States of America " Additionally, the United States obtained inherent sovereign authority over foreign relations when it secured its independence from Great Britain, *Curtiss-Wright*, 299 U.S. at 318, and the President exercises many of the powers that were formerly vested in the British crown, and that are not enumerated in the Constitution as belonging to Congress. *See, e.g.*, 1 William Blackstone, Commentaries on the Laws of England 257 (1771 ed ).

[10] Marshall made this remark as a member of the House of Representatives during a debate concerning an extradition ordered by President John Adams. *See* Edward S. Corwin, *The President: Office and Powers, 1787–1984* at 207–08 (Randall W. Bland et al. eds , 5th ed. 1984).

United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319–20 (1935). As a leading constitutional scholar concluded, *"[t]here is no more securely established principle of constitutional practice than the exclusive right of the President to be the nation's intermediary in its dealing with other nations."* Edward S. Corwin, *The President: Office and Powers, 1787–1984* at 214 (footnote omitted).

The Supreme Court addressed the difficult issue of the relationship between the President's foreign relations power and his power to assert jurisdiction over the territorial sea on behalf of the United States in *United States v. Louisiana,* 363 U.S. 1 (1960) (Harlan, J.). In that case, which involved rights under the Submerged Lands Act, the Court considered the power to fix state boundaries for domestic purposes and the power to fix them for international purposes. The executive branch had argued that no state could have a boundary of more than three miles because a state boundary must coincide with the three-mile limit of our claim to the territorial sea in order to avoid international embarrassment. The Court rejected that argument as an oversimplification of the issue. Justice Harlan described the relationship between the constitutional powers of the executive and the legislature branches as follows:

> The power to admit new States resides in Congress. *The President, on the other hand, is the constitutional representative of the United States in its dealings with foreign nations.* From the former springs the power to establish state boundaries; *from the latter comes the power to determine how far this country will claim territorial rights in the marginal sea as against other nations.* Any such determination is, of course, binding on the States. The exercise of Congress' power to admit new States, while it may have international consequences, also entails consequences as between Nation and State. We need not decide whether action by Congress fixing a State's territorial boundary more than three miles beyond its coast constitutes an overriding determination that the State, and therefore this country, are to claim that much territory against foreign nations. It is sufficient for present purposes to note that there is no question of Congress' power to fix state land and water boundaries as a domestic matter.

*Id.* at 35 (emphasis added).

The Court thus established two principles: first, that determination of the scope of the territorial sea as against foreign nations is one of the President's constitutional powers, and second, that establishing state boundaries is one of Congress' constitutional powers. The Court left unanswered the question of whether congressional action fixing a state boundary could result in a claim on behalf of the United States for the purpose of international law. The Court proceeded to carefully distinguish between the state boundaries established for domestic purposes by the Submerged Lands Act and the boundary of the territorial sea established by the President for international purposes. *Id.* at 33–36. The Court then held that

243

the state boundary for domestic purposes can be established by Congress irrespective of the limit of the territorial sea. *Id.* at 35–36.

Thus, it is clear that under *Louisiana* the President may use his power in the realm of foreign affairs to assert jurisdiction over the territorial sea on behalf of the United States as against other nations. We understand that this is the central purpose of the proposed proclamation and we have no doubt that the President may issue such an assertion of jurisdiction.

Indeed, history supports the Court's statement in *Louisiana* that the President's constitutional position as the representative of the United States in foreign relations authorizes him to make claims on behalf of the United States concerning the territorial sea. The primary example, of course, is the first claim of a three-mile territorial sea made on behalf of the United States by then-Secretary of State Thomas Jefferson in 1793. France, Great Britain, and Spain—all of which held territory in North America—were engaged in maritime hostilities off our Atlantic coast, an extension of wars ongoing in Europe. As part of an effort to undermine our policy of neutrality, France pressured us to state the extent of our territorial sea. *See* Sayre A. Swarztrauber, *The Three-Mile Territorial Sea* 56–59 (1972). In response, and although "neither Washington nor Jefferson wished to be hurried" into establishing the limit of our claim, President Washington instructed Jefferson to make an initial claim for the United States. *Id.* at 57.[11] Jefferson sent letters to both the French and British Ministers fixing a provisional limit. The letter to the British minister states:

> SIR: The President of the United States, thinking that, before it shall be finally decided to what distance from our sea shores the territorial protection of the United States shall be exercised, it will be proper to enter into friendly conferences and explanations with the powers chiefly interested in the navigation of the seas on our coasts, and relying that convenient occasions may be taken for these hereafter, finds it necessary in the mean time to fix provisionally on some distance for the present government of these questions. You are sensible that very different opinions and claims have been theretofore advanced on this subject. The greatest distance to which any respectable assent among nations has been at any time given, has been the extent of the human sight, estimated at upward of twenty miles, and the smallest distance, I believe, claimed by any nation whatever, is the utmost range of a cannon ball, usually stated at one sea-league. Some intermediate distances have also been insisted on, and that of three sea-leagues has some authority in its favor. The character of our coast, re-

---

[11] One month before Jefferson did so, President Washington observed, "[t]hree miles will, if I recollect rightly, bring [the captured Brigantine] Coningham within the rule of some decisions, but the *extent* of Territorial jurisdiction at Sea, has not yet been fixed, on account of some difficulties which occur in not being able to ascertain with precision what the general practice of Nations in this case has been." Washington to Governor Thomas Sim Lee, Oct. 16, 1793, *reprinted in* 33 *The Writings of George Washington* 132 (John C. Fitzpatrick ed., 1940)

markable in considerable parts of it for admitting no vessels of size to pass near the shores, would entitle us, in reason, to as broad a margin of protected navigation as any nation whatever. Reserving, however, the ultimate extent of this for future deliberation, *the President gives instructions to the officers acting under his authority, to consider those heretofore given them as restrained for the present to the distance of one sea-league or three geographical miles from the sea-shores.* This distance can admit of no opposition, as it is recognized by treaties between some of the powers with whom we are connected in commerce and navigation, and is as little, or less, than is claimed by any of them on their own coasts.

Letter from Mr. Jefferson to British Minister George Hammond, Nov. 8, 1793, *reprinted in* H.R. Doc. No. 324, 42d Cong., 2d Sess. 553–54 (1872).(emphasis added).

Secretary of State Jefferson's letters, stating the President's determination, have traditionally been viewed as the vehicle by which the United States claimed a three-mile territorial sea. *See, e.g., United States v. California*, 332 U.S. 19, 33 n.16 (1947). Thus, the President was responsible for the initial assertion of jurisdiction over the territorial sea on behalf of the United States. Moreover, Jefferson indicated that the executive reserved the right to extend the territorial sea in the future.[12] We believe that the context makes it clear that the assertion of a claim over the territorial sea was done as a function of the President's power as the representative of the United States in foreign relations, and that the power to do so has been confirmed by the Supreme Court in *Louisiana*.

The actions of two other Presidents who individually asserted control over sections of the high seas provide further support for the argument that the President's constitutional power as the representative of the United States in foreign relations includes the authority to claim portions of the sea for the United States for purposes of international law. In 1945 President Truman issued two proclamations, one concerning the continental shelf and another establishing a fisheries conservation zone. In the Continental Shelf Proclamation, President Truman stated that the "Government of the United States regards the natural resources of the subsoil and seabed of the continental shelf . . . [as] subject to its jurisdiction and control." Proclamation No. 2667, 3 C.F.R. 67 (1943–1948). This Office approved the Proclamation and advised that it was lawful both as a statement of national policy in foreign affairs and as an expansion of the territorial jurisdiction of the United States. Memorandum for Harold W. Judson, Assistant Attorney General, Office of Assistant Solicitor General, from William H. Rose (Sept. 16,

---

[12] Not only does the letter imply as much, but also Jefferson as President reportedly proposed to claim a broader territorial sea, emphasizing that in the 1793 letter he had "taken care expressly to reserve the subject for future consideration, with a view to this same doctrine for which he now contends." 1 *Memoirs of John Quincy Adams* 375–76 (Charles Francis Adams ed. 1874) (quoting a conversation with Jefferson).

1945). On the same day, President Truman also issued a proclamation which stated that the United States regarded it as proper to establish fishery conservation zones in certain areas of the high seas contiguous to the United States. Proclamation No. 2668, 3 C.F.R. 68 (1943–1948). Where the fishing was by United States nationals alone, "the United States regards it as proper to establish explicitly bounded conservation zones in which fishing activities shall be subject to the regulation and control of the United States." *Id.* The Proclamation then went on to declare that the United States' policy with respect to zones where nationals of other countries also fished would be determined by agreements between the United States and foreign states. This Proclamation, with its explicit statement of how the issue would be resolved with respect to other nations, was clearly based on the President's constitutional power to represent the United States' interests in the international arena. Finally, in 1983 President Reagan used the same power when he proclaimed "the sovereign rights and jurisdiction of the United States" to an exclusive economic zone extending two hundred miles from the coast of the United States. Proclamation No. 5030, 3 C.F.R. 22 (1984).[13] All of these precedents illustrate that the President's constitutional role as the representative of the United States in foreign relations permits him to proclaim jurisdiction over certain areas of the sea, consistent with international law, on behalf of the United States.

## B. The President's Power to Assert Sovereignty

The more difficult issue is whether the President may assert sovereignty over the territorial sea.[14] The key difference between this and an assertion of jurisdiction is that an assertion of sovereignty means that the territorial sea would be considered a part of the territory of the United States—*i.e.*, as much a part of the continental United States as a piece of land. While originally subject to doubt by some, the modern view is that the territorial sea is part of a nation and that a nation asserts full sovereignty rights over its territorial sea.[15] The issue therefore becomes whether the President has the authority to assert sovereignty over territory on behalf of the United States. As indicated below, Presidents have asserted this authority. Based on this historical record, we conclude that the President acting alone may assert sovereignty over an extended territorial sea on behalf of the United States, as a matter of discovery and occupation.

The Constitution does not specifically address the power to acquire territory on

---

[13] The President is also authorized to establish "defensive sea areas" by executive order for purposes of national defense. 18 U.S.C. § 2152. *See also* U.S. Naval War College, *International Law Situation and Documents—1956* at 603–04 (1957) (listing defensive sea areas established by the President).

[14] We believe an assertion of sovereignty over the territorial sea would be tantamount to, and would raise the same considerations as, the acquisition of land territory. *See supra* note 3. Because we believe that the territorial sea is probably territory in the same sense that land is territory, we must examine the means by which the United States may acquire territory.

[15] *See supra* note 3.

behalf of the United States.[16] Nonetheless, it is now agreed that the United States has the power to acquire territory as an incident of national sovereignty. *See, e.g., Mormon Church v. United States*, 136 U.S. 1, 42 (1890).[17] The United States has acquired territory through cession, purchase, conquest, annexation, treaty, and discovery and occupation.[18] These methods are permissible under international law[19] and have been approved by the Supreme Court.[20] The executive and the legislature have performed different roles in the acquisition of territory by each of these means. Unfortunately, the historical practice does not supply a precise explanation of where the Constitution places the power to acquire territory for the United States.

## 1. Assertion of Sovereignty by Treaty

The clearest source of constitutional power to acquire territory is the treaty making power. Under the Constitution, the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two-thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2. It is pursuant to that power that the United States has made most acquisitions of territory, as a result of either purchase or conquest.[21] Thus, "[i]t is too late in the history of the United

---

[16] As Senator (later Justice) Sutherland observed, "[t]here is no provision in the Constitution by which the national government is specifically authorized to acquire territory; and only by a great effort of the imagination can the substantive power to do so be found in the terms of any or all of the enumerated powers." George Sutherland, *Constitutional Power and World Affairs* 52 (1919)

[17] The authority of the United States to acquire territory was seriously questioned in the years immediately following the adoption of the Constitution. The argument against federal authority to acquire territory relied upon the Tenth Amendment provision that the powers not delegated to the federal government are reserved to the states or to the people 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1317 (2d ed. 1851). The Louisiana Purchase afforded the most urgent occasion for the consideration of the issue. Secretary of the Treasury Gallatin advised President Jefferson that "the power of acquiring territory is delegated to the United States by the several provisions which authorize the several branches of government to make war, to make treaties, and to govern the territory of the Union " Letter from Gallatin to Jefferson, Jan 13, 1803, *reprinted in* 1 *Writings of Albert Gallatin* 114 (Henry Adams ed. 1879) Jefferson himself was more concerned about his authority to incorporate the territory into the United States than the authority to acquire the territory *See* Letter from Jefferson to Gallatin, Jan 1803, *reprinted in* 1 *Writings of Albert Gallatin, supra*, at 115. *See also Downes v. Bidwell*, 182 U.S. 244, 322–33 (1901) (White, J , concurring). As the United States continued to acquire large areas of land, the power to acquire territory was taken to have been settled during the nineteenth century. *See* 2 J. Story, *supra*, § 1320.

[18] Territory is acquired by discovery and occupation where no other recognized nation asserts sovereignty over such territory. In contrast, when territory is acquired by treaty, purchase, cession, or conquest, it is acquired from another nation

[19] *See, e g*, Oppenheim, *supra*, § 211, at 498.

[20] The Supreme Court has acknowledged the authority to acquire territory by these methods *See, e g , Curtiss-Wright*, 299 U S. at 318 ("The power to acquire territory by discovery and occupation . . exist[s] as inherently inseparable from the conception of nationality."), *American Ins Co v Canter*, 26 U.S. (1 Pet.) 511, 542 (1828) (Marshall, C.J ) ("The Constitution confers absolutely on the government of the Union, the powers of making war, and of making treaties; consequently, that government possesses the power of acquiring territory, either by conquest or by treaty.")

[21] *See* Treaty Between the United States and the French Republic, Apr. 30, 1803, art. 1, 8 Stat. 200, 201 (Louisiana Purchase); Treaty of Amity, Settlement, and Limits, Between the United States of America and his Catholic Majesty, Feb 22, 1819, art. 2, 8 Stat. 252, 253 (cession of Florida by Spain); Treaty with Great Britain, June 15, 1846, art 1, 9 Stat. 869 (Oregon Compromise), Treaty of Peace, Friendship, Limits and Settlement between the United States of America and the Mexican Republic, Feb 2, 1848, art. 5, 9 Stat 922, 926–27 (cession of California by Mexico); Treaty with Mexico, Dec 30, 1853, art 1, 10 Stat. 1031, 1032 (Gadsden Purchase); Treaty with Russia, Mar 30, 1867, art. 1, 15 Stat. 539 (cession of Alaska by Russia); Isthmian Canal Convention, Nov. 18, 1903, arts. 2 & 3, 33 Stat. 2234, 2234–35 (cession of Panama Canal Zone by Panama), Convention Between the United States and Denmark for Cession of the Danish West Indies, Aug 4, 1916, art. 1, 39 Stat. 1706 (purchase of the Virgin Islands from Denmark).

247

States to question the right of acquiring territory by treaty." *Wilson v. Shaw*, 204 U.S. 24, 32 (1907). There is no doubt that the United States can acquire territory, including the territorial sea, by treaty.

## 2. Assertion of Sovereignty by the President Acting Alone - Discovery and Occupation

The more difficult issue is whether the President, acting alone, may acquire territory for the United States. Because of several venerable, and unchallenged, historical examples of such acquisitions, we believe that he can, even though the practice may be subject to some constitutional question. First and foremost, it can be reasonably argued that President Washington and Secretary of State Jefferson in making the original claim to the territorial sea relied on the President's constitutional power as the representative of the United States in foreign affairs to proclaim sovereignty, and not simply jurisdiction, over unclaimed territory. Although we have not found any evidence of Jefferson's view of the nature of the rights of the United States in the territorial sea, both Chief Justice Marshall and Justice Story viewed the territorial sea as part of the territory of the United States. *See Church v. Hubbart*, 6 U.S. (2 Cranch) at 234 (Marshall, C.J.); *The Ann*, 1 F. Cas. at 926–27 (Story, J.).

Similarly, there are two instances in which the President acquired territory acting alone by discovery and occupation.[22] In 1869, "[t]he Midway Islands . . . were formally taken possession of in the name of the United States . . . by order of the Secretary of the Navy." S. Rep. No. 194, 40th Cong., 3d Sess. 1 (1869). *See also* S. Exec. Doc. No. 79, 40th Cong., 2d Sess. (1868). And "[t]he United States claim[ed] jurisdiction . . . over . . . Wake's Island . . . possession of which was taken by the U.S.S. Bennington on January 17, 1899." Letter from Mr. Hill, Assistant Secretary of State, to Mr. Page, Feb. 27, 1900, 243 MS Dom. Let. 246, *quoted in* 1 J. Moore, *International Law Digest* § 111, at 555 (1906) ("Moore").[23]

The acquisition of Midway and Wake Islands by the Navy confirms that the President has the constitutional authority to acquire territory by discovery and occupation. Professor Henkin, for example, has stated that the President can "acquire territory by discovery or prescription." Louis Henkin, *Foreign Affairs and*

---

[22] There is a third example of unilateral acquisition by the President by executive agreement. In this regard, President Fillmore entered into an executive agreement in 1850 in which Great Britain "cede[d] to the United States such portion of the Horseshoe Reef as may be found requisite" for a lighthouse in Lake Erie near Buffalo Protocol of a Conference Held at the Foreign Office, Dec 9, 1850, 18 Stat. (Part 2) 325–26. *See also* 5 *Treaties and Other International Acts of the United States of America* 905–28 (Hunter Miller ed., 1937) (describing the acquisition of Horseshoe Reef). The acceptance of the cession appears to have been made pursuant to the President's power as representative of the United States in foreign affairs.

[23] The acquisition of American Samoa is frequently cited as evidence of the executive's independent authority to acquire territory for the United States. *See, e g* , 1 Westel Woodbury Willoughby, *The Constitutional Law of the United States* § 240a (2d ed 1929) President McKinley did assert control over American Samoa by executive order in 1900. He acted, however, one month after the Senate ratified a treaty in which Great Britain and Germany renounced "in favor of the United States of America" any rights they had to claim the islands. Convention between the United States, Germany, and Great Britain, Dec. 2, 1899, art. II, 31 Stat. 1878, 1879 (1900). Prior to the treaty, the United States, Great Britain, and Germany had failed in an effort to jointly manage the Samoan Islands. *See generally American Samoa A General Report by the Governor* 22–43 (1927), Moore, *supra*, § 110. The existence of the treaty partially undermines the claim that the acquisition of American Samoa is an example of acquisition by executive action alone.

*the Constitution* 48 (1972). Another writer concluded that "[t]he President is competent to recognize the acquisition of territory by discovery and occupation." Q. Wright, *The Control of American Foreign Relations* § 197, at 274 (1922). Moreover, it appears that the power to acquire territory by discovery and occupation "flows from [the President's] constitutional position as the representative organ of the government" for purposes of foreign affairs. *Id.* § 73, at 134 n.12.[24]

Practical considerations also illuminate why the President's power to assert sovereignty as a matter of discovery and occupation has gone unchallenged. As our representative in foreign affairs, the President is best situated to announce to other nations that the United States asserts sovereignty over territory previously unclaimed by another nation. With Midway and Wake Islands, for example, the President—through the Navy—acted because there was no other governmental representative present who could assert sovereignty on behalf of the United States.

The President's authority to acquire territory by discovery and occupation suggests to us that the President may assert sovereignty over the contemplated extension of the territorial sea. When territory is acquired by discovery and occupation, it is acquired by the assertion of the acquiring nation that it is henceforth sovereign in that territory. Similarly, when a nation asserts sovereignty over an extended territorial sea, it acquires territory which is not subject to the sovereignty of another nation. Accordingly, the considerations which explain why the President's constitutional position as the representative of the United States in foreign affairs allows him to acquire territory by discovery and occupation counsel that the same constitutional status allows him to proclaim sovereignty over an extended territorial sea.

Justice Harlan's statement for the Court in *Louisiana* that the power to assert territorial rights in the sea derives from the President's power as the constitutional representative of the United States in foreign affairs also appears to affirm the President's authority to assert sovereignty over the territorial sea. Even though Justice Harlan expressed doubt whether the territorial sea was "territory,"[25] he

---

[24] One writer, however, has concluded that the President cannot acquire territory without congressional approval See Lawson Reno, *The Power of the President to Acquire and Govern Territory,* 9 Geo Wash. L. Rev. 251, 285 (1941). Reno did not discuss the acquisition of Horseshoe Reef. He believed that legislative approval, albeit sometimes implicit, accompanied each of the other acquisitions of territory by the executive. He explained that the United States' sovereignty over Midway derived from the annexation of Hawaii, which had been sovereign over the island before annexation Reno, *supra,* at 275–76. He also asserted that the acquisition of Wake Island was unimportant because of the uncertainty surrounding the occupation by and claims of the United States in those territories *Id* at 276–77. Finally, he justified the United States' sovereignty over American Samoa as supported by implied congressional approval. *Id* at 279–81.

[25] Justice Harlan wrote, "The concept of a boundary in the sea," as opposed to one between two states on land, "is a more elusive one " *Louisiana,* 363 U S. at 33. He explained:

> The extent to which a nation can extend its power into the sea for any purpose is subject to the consent of other nations, and assertions of jurisdiction to different distances may be recognized for different purposes. In a manner of speaking, a nation which purports to exercise any rights to a given distance in the sea may be said to have a maritime boundary at that distance. But such a boundary, even if it delimits territorial waters, confers rights more limited than a land boundary. It is only in a very special sense, therefore, that the foreign policy of this country respecting the limit of territorial waters results in the establishment of a "national boundary "

*Id* at 34 (footnote omitted) Justice Harlan's view of the nature of the territorial sea as being something less than territory has since been rejected by the United States as well as modern international law scholars, *see supra* note 3

clearly indicated that the President has the power "to determine how far this country will claim territorial rights in the marginal sea *as against other nations*."[26]

In sum, we believe that the President may assert jurisdiction over an expanded territorial sea. Further, we believe that he may also assert sovereignty over an expanded territorial sea. To be sure, the historically more prevalent practice of territorial acquisition has been by treaty, but this in itself does not deny the authority of the President to make an assertion of sovereignty as a matter analogous to discovery and occupation. Nevertheless, to bolster the sufficiency of the proposed proclamation, we strongly recommend that the proclamation state both that it is asserting jurisdiction and that it is asserting sovereignty over the expanded territorial sea.[27] We believe that this formulation provides the best defense to any hypothetical challenge to the President's exercise of power—a challenge which, judging by the historical record, we would anticipate to be unlikely.

## C. Congress' Power to Assert Sovereignty over the Territorial Sea

We next consider whether H.R. 5069, which provides for the establishment of a territorial sea twelve miles wide, is within the constitutional power of Congress. H.R. 5069 states, "The sovereignty of the United States exists in accordance with international law over all areas that are part of the territorial sea of the United States." H.R. 5069, 100th Cong., 2d Sess., § 101(b) (1988). Congress, however, has never asserted jurisdiction or sovereignty over the territorial sea on behalf of the United States.[28] Because the President—not the Congress—has the constitutional authority to act as the representative of the United States in foreign affairs, Congress may proclaim jurisdiction or sovereignty over the territorial sea for in-

---

[26] *Id* at 35 (emphasis added). There may also be an argument that President Washington's unilateral assertion of sovereignty over the original territorial sea is now underpinned by longstanding congressional acquiescence. In addition, when the Senate ratified the Convention on the Territorial Sea, it agreed that the United States should have a territorial sea and it did not place a limit on its breadth. Further, it agreed that the United States was sovereign over the territorial sea —which as a matter of fact, for the United States, was the sea that President Washington had claimed on behalf of the United States Thus, there is at least arguable recognition by the legislature of the President's power in its explicit desire that the United States exercise full sovereignty over the territorial sea claimed by our first President.

[27] For example, the proclamation might state. "In order to assert jurisdiction as against foreign nations and to assert sovereignty on behalf of the United States . ."

[28] Congress has occasionally considered legislation to extend the territorial sea of the United States. *E.g.*, H.J. Res. 308, 91st Cong., 1st Sess. (1969), S.J. Res. 84, 91st Cong., 1st Sess (1969); S.J. Res 136, 90th Cong., 2d Sess (1968), H.R 10492, 88th Cong., 2d Sess (1964). None of these bills has been enacted

Of course, Congress has enacted statutes with respect to aspects of the United States' jurisdiction over the territorial sea and the high seas. A 1794 federal statute provided for federal court jurisdiction within the three-mile territorial sea. Act of June 5, 1794, ch 51, § 6, 1 Stat. 384. Many federal statutes govern conduct in various areas of our offshore waters. *See, e.g* , 14 U.S.C. § 89 (Coast Guard authority within waters over which the United States has jurisdiction for law enforcement purposes); 19 U.S.C. § 1581(a) (Customs authority within the "customs waters" as defined by 19 U S C. § 1401(j)) Additionally, Congress acted to implement President Truman's continental shelf proclamation for domestic law purposes by enacting the Outer Continental Shelf Act, 43 U S C. §§ 1331–1356, which claimed submerged lands for the federal government. However, all these statutes were enacted after the President's initial proclamations of sovereignty or jurisdiction within the area on behalf of the United States.

250

ternational law purposes only if it possesses a specific constitutional power therefor.[29]

We have identified two instances in which the United States acquired territory by legislative action. In 1845, the United States annexed Texas by joint resolution. Joint Res. 8, 5 Stat. 797 (1845). Several earlier proposals to acquire Texas after it gained its independence from Mexico in 1836 had failed. In particular, in 1844 the Senate rejected an annexation treaty negotiated with Texas by President Tyler. 13 Cong. Globe, 28th Cong., 1st Sess. 652 (1844). Congress then considered a proposal to annex Texas by joint resolution of Congress. Opponents of the measure contended that the United States could only annex territory by treaty. *See, e.g.*, 14 Cong. Globe, 28th Cong., 2d Sess. 247 (1845) (statement of Sen. Rives); *id.* at 278–81 (statement of Sen. Morehead); *id.* at 358–59 (statement of Sen. Crittenden). Supporters of the measure relied on Congress' power under Article IV, Section 3 of the Constitution to admit new states into the nation. *See, e.g., id.* at 246 (statement of Sen. Walker); *id.* at 297–98 (statement of Sen. Woodbury); *id.* at 334–36 (statement of Sen. McDuffie). These legislators emphasized that Texas was to enter the nation as a state, and that this situation was therefore distinguishable from prior instances in which the United States acquired land by treaty and subsequently governed it as territories. Congress' power to admit new states, it was argued, was the basis of constitutional power to affect the annexation. Congress approved the joint resolution, President Polk signed the measure, and Texas consented to the annexation in 1845.

The United States also annexed Hawaii by joint resolution in 1898. Joint Res. 55, 30 Stat. 750 (1898). Again, the Senate had already rejected an annexation treaty, this one negotiated by President McKinley with Hawaii. And again, Congress then considered a measure to annex the land by joint resolution. Indeed, Congress acted in explicit reliance on the procedure followed for the acquisition of Texas. As the Senate Foreign Relations Committee report pronounced, "[t]he joint resolution for the annexation of Hawaii to the United States . . . brings that subject within reach of the legislative power of Congress under the precedent that was established in the annexation of Texas." S. Rep. No. 681, 55th Cong., 2d Sess. 1 (1898). This argument, however, neglected one significant nuance: Hawaii was not being acquired as a state. Because the joint resolution annexing Texas relied on Congress' power to admit new states, "the method of annexing Texas did not constitute a proper precedent for the annexation of a land and people to be retained as a possession or in a territorial condition." Andrew C. McLaughlin, *A Constitutional History of the United States* 504 (1936). Opponents of the joint resolution stressed this distinction. *See, e.g.*,

---

[29] Congress has certain constitutional powers that can affect the claims of the United States over the seas. For example, Congress has the power to regulate foreign commerce, art. I, § 8, cl. 3, the power to define and punish crimes committed on the high seas and offenses against international law, art. I, § 8, cl. 10, and the power to declare war, art. I, § 8, cl. 11. Congress also exercises considerable authority over the territory of the United States. The Constitution authorizes Congress to admit new states, art. IV, § 3, cl 1, and to dispose of and regulate the property of the United States, art. IV, § 3, cl. 2.

31 Cong. Rec. 5975 (1898) (statement of Rep. Ball).[30] Moreover, as one constitutional scholar wrote:

> The constitutionality of the annexation of Hawaii, by a simple legislative act, was strenuously contested at the time both in Congress and by the press. The right to annex by treaty was not denied, but it was denied that this might be done by a simple legislative act. . . . Only by means of treaties, it was asserted, can the relations between States be governed, for a legislative act is necessarily without extraterritorial force—confined in its operation to the territory of the State by whose legislature it is enacted.

1 Westel Woodbury Willoughby, *The Constitutional Law of the United States* § 239, at 427 (2d ed. 1929).

Notwithstanding these constitutional objections, Congress approved the joint resolution and President McKinley signed the measure in 1898. Nevertheless, whether this action demonstrates the constitutional power of Congress to acquire territory is certainly questionable. The stated justification for the joint resolution—the previous acquisition of Texas—simply ignores the reliance the 1845 Congress placed on its power to admit new states. It is therefore unclear which constitutional power Congress exercised when it acquired Hawaii by joint resolution. Accordingly, it is doubtful that the acquisition of Hawaii can serve as an appropriate precedent for a congressional assertion of sovereignty over an extended territorial sea.[31]

We believe that the only clear congressional power to acquire territory derives from the constitutional power of Congress to admit new states into the union. The admission of Texas is an example of the exercise of this power. Additionally, the Supreme Court in *Louisiana* recognized that this power includes "the power to establish state boundaries." 363 U.S. at 35. The Court explained, however, that it is not this power, but rather the President's constitutional status as the repre-

---

[30] Representative Ball argued:
> Advocates of the annexation of Texas rested their case upon the express power conferred upon Congress in the Constitution to admit new States Opponents of the annexation of Texas contended that even that express power did not confer the right to admit States not carved from territory already belonging to the United States or some one of the States forming the Federal Union. Whether, therefore, we subscribe to the one or the other school of thought in that matter, we can find no precedent to sustain the method here proposed for admitting foreign territory.

31 Cong. Rec 5975 (1898). He thus characterized the effort to annex Hawaii by joint resolution after the defeat of the treaty as "a deliberate attempt to do unlawfully that which can not be lawfully done " *Id*

[31] Additionally, Congress has authorized the extension of United States' control to guano islands discovered and occupied by citizens of the United States The Guano Islands Act provided:
> Whenever any citizen of the United States discovers a deposit of guano on any island, rock, or key, not within the lawful jurisdiction of any other government, and not occupied by the citizens of any other government, and takes peaceable possession thereof, and occupies the same, such island, rock, or key may, at the discretion of the President, be considered as appertaining to the United States.

48 U.S.C. § 1411. In *Jones v. United States*, 137 U.S. 202 (1890), the Supreme Court held that the statute was valid and that Navassa, a guano island claimed under that statute, "must be considered as appertaining to the United States." *Id.* at 224. The Guano Islands Act does not appear to be an explicit claim of territory by Congress.

sentative of the United States in foreign affairs, which authorizes the United States to claim territorial rights in the sea for the purpose of international law. The Court left open the question of whether Congress could establish a state boundary of more than three miles beyond its coast that would constitute an overriding claim on behalf of the United States under international law. *Id.* Indeed, elsewhere in its opinion the Court hints that congressional action cannot have such an effect. *Id.* at 51.

In the time permitted for our review we are unable to resolve the matter definitively, but we believe that H.R. 5069 raises serious constitutional questions. We have been unable to identify a basis for the bill in any source of constitutional authority. Because of these concerns, we believe that, absent a treaty, the proposed proclamation represents the most defensible means of asserting sovereignty over the territorial sea.

## III. The Proclamation's Effect on Domestic Law

In this section, we consider what effect the proposed proclamation will have on domestic law. By its terms, the proclamation will make clear that it is not intended to affect domestic law. Congress may, however, have enacted statutes that are intended to be linked to the extent of the United States' territorial sea under international law. The issue, therefore, in determining the effect of the proclamation on domestic law is whether Congress intended for the jurisdiction of any existing statute to include an expanded territorial sea. Thus, the question is one of legislative intent.[32]

## A. Statutory Intent

The statutes potentially affected by the proclamation are too numerous to consider individually in the time permitted. However, we can discuss some of the considerations relevant to a determination whether Congress intended the application of a statute to be affected by a change in the breadth of the United States' territorial sea, and then make such a determination with respect to the particular statute of interest to the inter-agency working group—the Coastal Zone Management Act, 16 U.S.C. §§ 1451–1464 ("CZMA" or "Act").

The most important consideration in determining whether Congress intended a statute to be affected by a change in the breadth of the territorial sea is the language of the statute. If a statute includes a provision that simply overlaps or coincides with the existing territorial sea—such as the provision "three miles seaward from the coast of the United States"—the operation of the statute will

---

[32] While the Constitution provides the President with the power to represent the United States in foreign affairs and thus to assert a claim under international law, *see supra* pp. 241–50, the Constitution grants Congress the power to enact statutes with domestic effect within the areas of its enumerated powers. Congress could enact legislation stating that the area affected by a statute could be expanded either by presidential or congressional action The President can be delegated the authority to fill in the details of a statute, such as determining the extent of a statute's jurisdiction. Congress can always amend a statute, through passage of a new law, to expand its coverage.

probably not, in the absence of special circumstances, be affected by a change in the territorial sea. Indeed, the statute does not appear to invoke the concept of the territorial sea at all, except for denoting an area that coincides with the territorial sea. A similar case is presented by a statute that uses the term "territorial sea" but then defines it as "three miles seaward from the coast of the United States." Although the statute refers to the territorial sea, the definition reveals that Congress understood the area involved as the three-mile territorial sea in existence when the statute was enacted.

Of course, the more difficult cases will arise where Congress has used more ambiguous language. The best example is a statute which refers to the term "territorial sea" without further defining it. Congress could have intended the term to refer to the three miles that history and existing practice had defined or Congress could have intended the statute's jurisdiction to always track the extent of the United States' assertion of territorial sea under international law. A determination of congressional intent in these circumstances will therefore require further inquiry into the purpose and structure of a particular statute, and may include reference to the legislative history, the interpretation of the statute by the executive branch and the courts, and the meaning of similar statutes governing the same subject matter.

## B. Coastal Zone Management Act

The CZMA was enacted in 1972 to provide a program of federal grants to the states for the purposes of (1) preserving and developing the Nation's coastal zone and (2) encouraging and assisting the states in exercising their coastal zone responsibilities through the development of management programs designed to achieve wise and coordinated use of coastal zone resources. 16 U.S.C. § 1452. Under the Act, the Secretary of Commerce may make various grants to states for the development, implementation and protection of management programs. 16 U.S.C. §§ 1454–1464.

The states establish management programs, subject to the approval of the Secretary, within the area of the coastal zone. The CZMA defines "coastal zone" as

> the coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of the several coastal states . . . . The zone extends, in Great Lakes waters, to the international boundary between the United States and Canada and, in other areas, *seaward to the outer limit of the United States territorial sea.* The zone extends inland from the shorelines only to the extent necessary to control shorelands, the uses of which have a direct and significant impact on the coastal waters. Excluded from the coastal zone are lands the use of which is by law subject solely to the discretion of or which is held in trust by the Federal Government, its officers or agents.

16 U.S.C. § 1453(1) (emphasis added). Thus, the CZMA defines the coastal zone partly in terms of the "United States territorial sea."

The text of the CZMA does not expressly indicate whether Congress intended the coastal zone to be affected by an expanded claim of territorial sea under international law. Inferences from the purposes, structure, and legislative history of the Act, however, suggest that the better view is that Congress intended the coastal zone to be stationary.[33]

## 1. Statutory Purpose and Structure

There are several purposive and structural reasons why we believe Congress intended the reference to "territorial sea" in the CZMA to refer to the existing three mile area. First, Congress made numerous findings when enacting the CZMA. Congress stated that the coastal zone is rich in natural resources, that it is "ecologically fragile," that it has experienced a loss of living marine resources and nutrient-rich areas, and that present institutional arrangements for planning and regulating the coastal zone are inadequate.[34] 16 U.S.C. § 1451. These findings were based on empirical observation and investigation of the coastal zone that existed at the time the CZMA was enacted, and it was the coastal area out to three miles that was the focus of Congress' concern. These factual findings indicate that it is unlikely that the coastal zone was intended to change with the expansion of the territorial sea. Congress could not have known whether these findings would also be true of other areas over which the United States might assert its jurisdiction or sovereignty. Different conditions obviously could hold depending upon whether the President asserted a territorial sea of three, twelve, or two hundred miles.

Second, it is unlikely that Congress would have intended the CZMA's scope to expand beyond the clear limit of the states' jurisdiction. The central purpose of the CZMA was to assist and encourage the states to regulate use of the coastal zone,[35] and there is serious question whether the states can extend their regulatory jurisdiction beyond the limit of the three-mile belt. In this regard, there are two reasons why the states would not be able to regulate an expanded section of the territorial sea in the comprehensive way contemplated by the CZMA: the states do not have jurisdiction over the soil beneath the nine miles of the expanded territorial sea and it is very uncertain whether the states could assert jurisdiction

---

[33] In interpreting the CZMA, there are both the Act as originally passed in 1972 and the subsequent amendments to the Act to consider. See Pub. L. Nos. 94–370 (1976), 90 Stat. 1013 & 96–464, 94 Stat. 2060 (1980). The definition of coastal zone was included in the original Act, and has not been amended in any substantive respect. We accordingly look principally to the original Act in determining Congress' intent, and only consider the amendments to determine whether they were intended to alter the meaning of the original definition. See Secretary of Interior v California, 464 U S. 312, 330 n.15, 331–32 (1984) (relying principally upon legislative history of the original CZMA, but also considering later provisions).

[34] See also S. Rep No. 753, 92d Cong., 2d Sess. 4 (1972) ("Why single out the coastal zone for special management attention? . . . The fact is that the waters and narrow strip of land within the coastal zone is where the most critical demands, needs and problems presently exist.")

[35] See 16 U.S.C. §§ 1451(i), 1452(2). Moreover, section 1455(d) of title 16 requires the Secretary of Commerce, prior to approving a state management program, to find that the State "has authority for the management of the coastal zone in accordance with the management program," including the power to administer land and water use regulations, to control development, and to condemn property, for the purpose of achieving compliance with the management program.

255

even to regulate the waters of that section. We discuss these points in turn.

States had for decades generally assumed that they at least controlled the land beneath the territorial sea. However, in *United States v. California*, the Supreme Court held—contrary to many states' assumption—that "the Federal Government rather than the state has paramount rights in and power over [the three mile marginal] belt, an incident to which is full dominion over the resources of the soil under that water area." 332 U.S. at 38–39. In response to vigorous state protests to this opinion, Congress in 1953 enacted the Submerged Lands Act, 43 U.S.C. §§ 1301–1315, which granted to the states the lands beneath the navigable waters within their boundaries, 43 U.S.C. § 1311(a), which boundaries were at a minimum to be set at "a line three geographical miles distant from [a state's] coast line." *Id.* § 1312.[36] In the same year, Congress also passed the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356 ("OCSLA"), which established claims for the federal government over the submerged lands which lay seaward of the submerged lands controlled by the states, *i.e.*, the submerged lands beyond the three-mile limit.[37] 43 U.S.C. §§ 1331(a), 1332(1) & 1333(a)(1). Accordingly, if the President extends the United States' territorial sea to twelve miles, the states could not exercise jurisdiction over the submerged lands of that area. These lands are controlled by the federal government pursuant to OCSLA.

Second, it is not clear whether the states could assert jurisdiction even over the waters of the expanded portion of the territorial sea. "[A]n assertion of a wider territorial sea by the United States . . . would not itself give rights in the additional zone to the adjacent States. Unless Congress determined otherwise, the zone between three and twelve miles would be under the exclusive authority of the Federal Government." Restatement Third § 512, reporters' note 2. It is therefore reasonable to assume that the states' boundaries and regulatory jurisdiction are fixed at their existing limits, and that states have no more power to assert jurisdiction over the expanded portion of the territorial sea than they do over other territories that are acquired by the United States. *See also Louisiana*, 363 U.S. at 35; *United States v. Maine*, 469 U.S. 504, 513 (1985).[38]

---

[36] More precisely, the Submerged Lands Act conferred land on the states based on state boundaries as they existed at the time the state became a member of the Union, or as approved by Congress. 43 U.S.C § 1301(b) States that had not asserted seaward boundaries of three miles were authorized to do so 43 U.S.C. § 1312. Moreover, the Act did not prejudice the existence of a further seaward boundary if one existed when the state was admitted to the Union or if the boundary had been approved by Congress, but limited the extent of seaward boundaries to three miles into the Atlantic and Pacific Oceans, and to approximately nine miles into the Gulf of Mexico *See United States v. Louisiana*, 363 U.S 1 (1960) (historical evidence supported Texas' claim to lands beneath navigable waters within nine miles of its coast in the Gulf of Mexico)

[37] President Truman had asserted jurisdiction over the continental shelf on behalf of the United States in 1945. Proc. No. 2667, 3 C F R. 67 (1943–1948) *See supra* p 245.

[38] However, this is not to say that the states might not attempt to expand their regulatory jurisdiction. The states might assert this power as an aspect of their sovereignty retained under the Tenth Amendment, at least to the extent that the jurisdiction did not conflict with international law, or the states might attempt to found the jurisdiction on historical grounds. *See Manchester v Massachusetts*, 139 U.S. 240, 264 (1891), *Skiriotes v Florida*, 313 U.S. 69, 77 (1941). *But see United States v. California*, 332 U S. at 37 (distinguishing *Manchester v Massachusetts*); *United States v. California*, 381 U.S. 139, 168–69 (1965) ("Although some dicta in [*Manchester*] may be read to support" the view that "a State may draw its boundaries as it pleases within limits recognized by the law of nations regardless of the position taken by the United States," "we do not so interpret the opinion The case involved neither an expansion of our traditional international boundary nor opposition by the United States to the position taken by the State.").

However, it is not necessary for present purposes to decide whether the states could assert jurisdiction to regulate the waters of the expanded section of the territorial sea. Thus, given the absence of any clear state authority over the soil beneath an expanded territorial sea and the uncertainty of state authority over the expanded water area, it is most unlikely that the Congress that enacted the CZMA would have simply assumed that state authority would expand if the United States' territorial sea expanded.

## 2. Legislative History

An examination of the legislative history of the definition of coastal zone also supports this conclusion. In particular, the CZMA represented a compromise between Senate and House bills. The bill reported by the Senate Committee on Commerce included a definition of the coastal zone similar to the final Act. It provided:

> The zone terminates, in Great Lake waters, at the international boundary between the United States and Canada and, in other areas, extends seaward to the outer limit of the United States territorial sea.

S. Rep. No. 753, 92d Cong., 2d Sess. 47 (1972).

The only relevant discussion of this provision in the Senate Report states that "[t]he outer limit of the [coastal] zone is the outer limit of the territorial sea, beyond which the States have no clear authority to act." *Id.* at 9. Thus, the Senate Report is consistent with the conclusion that the coastal zone was intended to extend only to the limit of the existing three mile territorial sea, the limit of state jurisdiction.

After issuance of the Report, however, the definition of coastal zone was amended on the floor of the Senate. Senator Spong was concerned that the bill "might have a prejudicial effect upon the matter of United States against Maine,"[39] in which the United States was seeking a determination against the thirteen Atlantic coastal states concerning control over the submerged lands "of the bed of the Atlantic Ocean more than three geographic miles from the coastline." 118 Cong. Rec. 14,185 (1972). Thus, he proposed an amendment, "the sole purpose of which is to assure that the bill will have no prejudicial effect upon the litigation." *Id.* The amendment changed the definition of coastal zone to the following:

> The zone terminates, in Great Lake waters, at the international boundary between the United States and Canada and, in other areas, extends seaward to the outer limit of the *legally recognized territorial seas of the respective coastal states, but shall not extend beyond the limits of State jurisdiction as established by the*

---

[39] *Cf United States v. Maine*, 420 U S. 515 (1975).

> *Submerged Lands Act of May 22, 1953 and the Outer Continental Shelf Act of 1953.*

*Id.* at 14,185 (emphasis added to indicate changed language). Senator Hollings also spoke in support of the amendment. He stated:

> We have been trying to reconcile the amendments so that we would not interfere with any legal contention of any of the several States at the present time involved in court procedures. At the same time we wanted to make certain that Federal jurisdiction was unimpaired beyond the 3-mile limit in the territorial sea.

*Id.*[40] Thus, the change in the Senate bill language was not intended to have significant effect on the issue at hand, but was only included to avoid affecting pending litigation. The language in the House bill was virtually identical to that in the original Senate bill. The House bill provided:

> The zone extends, in Great Lakes waters, to the international boundary between the United States and Canada and, in other areas, seaward to the outer limit of the United States territorial sea.

H.R. Rep. No. 1049, 92d Cong., 2d Sess. 2 (1972). The House Report, however, adopted a different understanding of the provision. The House Report stated that the coastal zone extends outward

> to the outer limit of the territorial sea which, under the present posture of international law, means three miles from the base line from which the territorial sea of the United States is measured. *Should the United States, by future action, either through international agreement or by unilateral action, extend the limits of the United States territorial sea further than the present limits, the coastal zone would likewise be expanded, at least to the extent that the expanded water area and the adjacent shore lands would strongly influence each other,* consistent with the general definition first referred to above.[41]

---

[40] Senator Moss stated that "[t]his makes clear that this bill focuses on the territorial sea or the area that is within State jurisdiction, and preserves the Federal jurisdiction beyond, which is not to be considered or disturbed by the bill at this time. If we want to do something about that later, we will have another bill, and another opportunity." 118 Cong. Rec. 14,185 (1972).

[41] The "general definition" to which the House Report refers is as follows: "'Coastal Zone' means the coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of the several coastal states." H.R. Rep. No. 1049, *supra*, at 2.

*Id.* at 13–14 (emphasis added). This language in the House Report expresses an intent that, at least in certain circumstances, the definition of coastal zone could be extended by a change in the breadth of the territorial sea.

The difference in the language between the House and Senate bills was resolved by the Conference Committee. The Conference Report stated:

> The Managers agreed to adopt the House language as to the seaward extent of the coastal zone, because of its clarity and brevity. At the same time, it should be made clear that the provisions of this definition are not in any way intended to affect the litigation now pending between the United States and the Atlantic coastal states as to the extent of state jurisdiction. Nor does the seaward limit in any way change the state or Federal interests in resources of the territorial waters or Continental Shelf, as provided for in the Submerged Lands Act and the Outer Continental Shelf Lands Act.

H.R. Conf. Rep. No. 1544, 92d Cong., 2d Sess. 12 (1972).

While it might be argued that the Conference Committee's adoption of the House bill language also adopted the explanatory language in the House Report, the Conference Report did not say so. Rather, it stated that the language was taken because of its "clarity and brevity." Moreover, the Conference Report then immediately went on to state what is in effect a paraphrase of the Senate bill—saying that the bill is not intended to affect the pending litigation and that the seaward limit is understood in accordance with the Submerged Lands Act and the OCSLA. Thus, the Conference Report appeared to make a special effort to clarify that despite its choice of the House language (which was also the language of the original Senate version), it accepted the Senate's understanding of the provision.[42]

Moreover, the Conference Report would appear to be inconsistent with the House Report's language concerning extension of the coastal zone. The third and final sentence in the Conference Report discussing the definition reiterates the congressional concern that CZMA do nothing to affect the statutory allocation of state and national responsibility in the area. *Id.* If the CZMA permitted an expansion of the coastal zone, and states asserted regulatory jurisdiction over the extended territorial sea, however, that balance of authority would be affected.[43]

---

[42] The House bill had included various provisions extending the scope of the CZMA beyond the three-mile limit, but the Conference Committee had rejected all the provisions The language in the House Report may therefore be understood as indicative of the House's intent that the CZMA extend beyond the three-mile limit in certain circumstances. *See Secretary of Interior v. California*, 464 U S. 312 (1984) (discussed below). But because rejection of these provisions indicates that this intention was not adopted by the Conference Committee, we believe the better view is that the language in the House Report, like the provisions eliminated in the House bill, does not reflect the final congressional intent

[43] Extension of the coastal zone to the land and sea beyond the three-mile limit would have provided the states with additional control over OCS resources States would have the authority under section 307(c)(3) of the original act, 16 U S.C. § 1456(c)(3)(A), to veto (subject to a limited federal override) OCS activities that affected the waters of the new, extended coastal zone.

This understanding of the legislative history is bolstered by the Supreme Court's decision in *Secretary of the Interior v. California*, 464 U.S. 312 (1984). This case involved the interpretation of section 307(c)(1) of the CZMA, 16 U.S.C. § 1456(c)(1), which requires federal agencies to conduct activities "directly affecting the coastal zone" consistently with approved state management programs. The Court held that the only federal activities "directly affecting" the coastal zone were those conducted "on federal lands physically situated in the coastal zone but excluded from the zone as formally defined by the Act," and did not include activities conducted beyond the three-mile seaward limit of the coastal zone, as California had argued. 464 U.S. at 330. The Court based its holding that the ambiguous "directly affecting" language did not apply to activities seaward of the three-mile limit on a review of the legislative history. The Court concluded that "[e]very time it faced the issue in the CZMA debates, Congress deliberately and systematically insisted that no part of CZMA" was to extend beyond the three-mile limit. *Id.* at 324.

The Court noted the "repeated statements" in the floor debates in Congress that "the allocation of state and federal jurisdiction over the coastal zone and the [outer continental shelf] was not to be changed in any way" by the Act. *Id.* The Court listed nine statements, including: "This bill covers the territorial seas; it does not cover the Outer Continental Shelf." 118 Cong. Rec. 14,180 (1972) (remark of Sen. Stevens); "[T]his bill attempts to deal with the Territorial Sea, not the Outer Continental Shelf." *id.* at 14,184 (remark of Sen. Moss); "[W]e wanted to make certain that Federal jurisdiction was unimpaired beyond the 3-mile limit in the territorial sea." *id.* at 14,185 (remark of Sen. Hollings); "[T]he Federal Government has jurisdiction outside the State area, from 3 to 12 miles at sea." *id.* at 35,550 (remark of Rep. Anderson).

Moreover, the Court relied upon the fact that Congress "debated and firmly rejected" four proposals "to extend parts of CZMA" to the outer continental shelf. 464 U.S. at 325. The most significant of these proposals was contained in section 313 of the House bill, which would have required the Secretary of Commerce to develop a management program for "the area outside the coastal zone and within twelve miles" of the coast. This provision, however, was eliminated by the Conference Committee because, as explained in the Conference Report, "the provisions relating thereto did not prescribe sufficient standards or criteria *and would create potential conflicts with legislation already in existence concerning Continental Shelf resources.*" *Id.* at 327 (quoting H.R. Conf. Rep. No. 1544, *supra*, at 15 (emphasis supplied by Supreme Court)). Congress also rejected proposals to permit the Secretary of Commerce to extend established state coastal zone marine sanctuaries beyond the coastal zone, to require approval of state governors when federal agencies sought to construct or to license construction of facilities beyond the territorial sea,[44] and to invite the National Academy of Sciences to investigate environmental hazards attendant on offshore drilling on the Atlantic Outer Continental Shelf.[45] Viewing this evidence in its

---

[44] 118 Cong. Rec. 14,183–84 (1972).
[45] 118 Cong. Rec. 14,180–81, 14,191, 35,547 (1972).

totality, the Court concluded[46] that "Congress expressly intended to remove control of [outer continental shelf] resources from CZMA's scope." *Id.* at 324.[47]

The Supreme Court's understanding of Congress' intent also applies to the present issue. Congress' intention to exclude outer continental shelf resources from the scope of the CZMA, which required that the "directly affecting" provision be applied only to activities within the three-mile coastal zone, was based on a desire to limit the applicability of the CZMA to the three-mile limit. Therefore, the legislative history, as interpreted by the Supreme Court, also indicates that Congress did not intend for the coastal zone itself to be expanded beyond that three-mile limit.

### 3. Subsequent Amendments

Since 1972, Congress has passed legislation affecting the relationship between the federal and state authority contemplated by the original CZMA. While these amendments are of limited significance in interpreting the original CZMA, we discuss them because they are consistent with a continuing congressional intent to consider carefully any change in the balance of state and federal authority in this area.

The CZMA has been amended several times,[48] and OCSLA has also been substantially modified. In contrast to the original CZMA, these amendments expressly give the states a role concerning the federal governance of activities on the OCS. The amendments establish a complex, interconnected statutory scheme, which contains precise and detailed limits on state authority, varying in different circumstances. That Congress has enacted such a scheme suggests that it has considered and legislated on the role of the states very carefully, and would not desire any modification of that role in the CZMA in the absence of new legislation. We describe the amendments below.

The CZMA was first significantly amended by the Coastal Zone Management Amendments of 1976, Pub. L. No. 94–370, 90 Stat. 1013 (1976) ("1976 Amendment"). The 1976 Amendment effected two important changes in the role of the

---

[46] We also believe that section 307(c)(3) of the original Act, 16 U.S.C § 1456(c)(3)(A), did not, as originally enacted, apply to activities seaward of the coastal zone Section 307(c)(3) required activities "affecting land or water uses in the coastal zone" to be subjected to review for consistency with state management programs, and was a sister provision to section 307(c)(1) construed in *Secretary of Interior v California* Based on the logic and language of that case, the Court's statement that the Congress that passed the original CZMA "expressly intended to remove control of [outer continental shelf] resources from CZMA's scope" also applies to section 307(c)(3). We need not decide, however, whether the scope of this provision has been changed by amendments to the Act. *See e g* , Pub. L. No. 94–370, 90 Stat. 1018 (1976) (codified at 16 U.S.C. § 1456(c)(3)(B)).

[47] It is clear that Congress was concerned with more than whether a provision violated international law. The Conference Committee rejected section 313 of the House bill because it would have created potential conflicts with existing legislation governing the outer continental shelf, not because it would violate international law H.R. Conf. Rep. No. 1544, 92d Cong., 2d Sess. 15 (1972). Thus, Congress' decision to extend the coastal zone seaward only three miles was in part the product of its conscious coordination of the CZMA with other statutory provisions governing the outer continental shelf, provisions which would be unaffected by a change in the United States' territorial sea.

[48] The CZMA has been amended at least seven times. Here, we focus on the 1976 amendment because it contains the principal changes in federal and state authority. *See also* Coastal Zone Management Improvements Act of 1980, Pub L. No 96–464, 94 Stat 2060 (1980)

261

states, both of which recognize and attempt to address the effects of OCS activities on the coastal zones of the states. First, section 6 requires federal licenses for OCS exploration or development to attempt to conform to management plans of affected states. The Secretary of Commerce may override the state's determination that an activity is inconsistent with its plan only upon finding that the proposed activities are consistent with the objectives of the CZMA or are necessary in the interest of national security. 16 U.S.C. § 1456(c)(3)(B). Second, section 7 of the 1976 Amendment establishes a Coastal Energy Impact Program that provides financial assistance to states to meet needs resulting from and reflecting the impact of coastal energy activities, including OCS activities, which for technical reasons must be sited in or near the state's coastal zone. 16 U.S.C. § 1456a.

In 1978, Congress further modified the allocation of federal and state responsibilities through enactment of the Outer Continental Shelf Lands Act Amendments of 1978, Pub. L. No. 95–372, 92 Stat. 629 ("OCSLA Amendment"). This amendment substantially changed the original OCSLA by including numerous provisions requiring state participation in OCS activities.[49]

Thus, the amendments to both the CZMA and the OCSLA establish a complex and detailed statutory scheme concerning the limits of state authority to affect OCS activities.[50] Over the years, Congress has provided the states with grants to respond to the effects of OCS activities, with the authority to review and make recommendations concerning OCS activities, and with the power to veto OCS activities subject to limited federal override. These detailed amendments to the CZMA and OCSLA are thus consistent with a congressional understanding of a coastal zone and state authority which would not automatically expand with the expansion of the territorial sea.

To summarize, on the basis of the purpose, structure and legislative history of the CZMA, we conclude that Congress did not intend the coastal zone to be affected by an expansion of the territorial sea under international law. The language in the House Report might suggest a contrary conclusion, but that language was not accepted by the Conference Committee and, in any case, is outweighed by

---

[49] The OCSLA Amendment provides for various levels of state participation in the process of developing offshore oil. *Secretary of Interior v. California,* 464 U S. at 337. The Secretary of Interior must, while preparing a schedule for proposed lease sales on the OCS, solicit comments from states that might be affected, and must explain, in a report to Congress and the President, why a state recommendation was not accepted. 43 U S.C. § 1344(c) & (d) Second, the Secretary must accept state recommendations concerning the size, timing or location of proposed lease sales, if he determines that they reasonably balance national and state interests 43 U S C § 1345(a) & (c). Third, an applicant's exploration plan must certify that the proposed activities are consistent with state CZMA management programs unless the Secretary of Commerce finds that the proposed activities are consistent with the objectives of the CZMA or are necessary in the interest of national security 43 U.S.C. § 1340(c) Finally, the Secretary of Interior must accept state recommendations concerning development and production plans if they provide a reasonable balance between state and national interests. The plans must also be consistent with state CZMA management plans and will only be approved, absent state consent, if the Secretary of Commerce finds that the proposed activities are consistent with the objectives of the CZMA or are necessary for national security. 43 U.S.C. § 1351

[50] Writing of the relationship between the OCSLA Amendment and CZMA, the Supreme Court stated that "Congress has thus taken pains to separate various federal decisions" in the process of granting authority to conduct OCS development and to subject only the third and fourth stages to review for consistency with state management plans. *Secretary of Interior v California,* 464 U.S. at 340.

262

the structure of the Act and the legislative history, as interpreted by the Supreme Court.

We recognize, however, that this conclusion is not free from doubt, and that a court could construe the coverage of the CZMA—or other statutes which refer to the territorial sea—as expanding with the extension of the territorial sea. Such a result can be avoided. As discussed, whether the coverage of a statute which refers to the territorial sea is affected by the extension of the territorial sea is a question of legislative intent. Therefore, Congress could foreclose an individualized judicial assessment of each federal statute by enacting legislation which negates the expansion of the coverage of any domestic statute by the extension of the territorial sea for international purposes. An express declaration by Congress that the presidential proclamation extending the territorial sea has no effect on the operation of domestic statutes which rely upon the concept of the territorial sea would provide a simple and decisive rejoinder to any claim of automatic expansion. Thus, although we do not believe that the coverage of the CZMA should be construed to expand as a necessary result of the presidential proclamation, we recommend that the President seek legislation to conclusively preclude any contrary decision on the CZMA or any other statute by the courts.

## Conclusion

We believe that the President may make an extended jurisdictional claim to the territorial sea from three to twelve miles by proclamation. We also find venerable historical evidence supporting the view that the President's constitutional role as the representative of the United States in foreign relations empowers him to extend the territorial sea and assert sovereignty over it, although most such claims in our nation's history have been executed by treaty. It is more doubtful, however, that Congress, acting alone, may extend the territorial sea beyond the present boundary for international purposes.

The domestic effect of the extension of the territorial sea on federal statutes that refer to the territorial sea must be determined by examining Congress' intent in passing each relevant statute. We have concluded that the better view is that the expansion of the territorial sea will not extend the coverage of the Coastal Zone Management Act, the statute which was identified to us as presenting special concern. However, we recognize that the effect of the proclamation on the CZMA and numerous other federal statutes will continue to be uncertain until final judicial resolution. We therefore recommend that the President seek legislation providing that no federal statute is affected by the President's proclamation to extend the breadth of the territorial sea from three miles to twelve miles.

DOUGLAS W. KMIEC
*Acting Assistant Attorney General*
*Office of Legal Counsel*